376 P.2d 948

STATE of Utah in the Interest of F——, D—— and P——, minor children, Respondent,

v.

**Gwen Dalton DADE, Appellant.**

No. 9636.

Supreme Court of Utah.

Dec. 20, 1962.

5. Cleary, Res Judicata Reexamined, 57 Yale L.J. 339, 346.

L. G. Bingham, Ogden, for appellant.

A. Pratt Kesler, Atty. Gen., Neil D. Schaerrer, Asst. Atty. Gen., Salt Lake City, for respondent.

CROCKETT, Justice.

Appeal from a judgment of the Juvenile Court of Weber County depriving appellant of custody of her three minor children, ages six, five and two.

The record of family difficulty in regard to these children goes back to May, 1956, when the eldest child was eight months old. The appellant's mother filed a petition with the Juvenile Court, alleging that conditions in the home were detrimental to his health and well-being. After proceedings thereon, the appellant was, on July 6, 1956, deprived of his custody because of her inability to care for him. The child was later released to her husband, and thus, in effect, to her, as they were in the same home. The record

shows other referrals to the Juvenile Court concerning the mistreatment and lack of care of that child and two others born subsequently.

On July 21, 1960, a petition was filed which alleged that:

"* * * both said mother and father by reason of their mental condition cannot properly care for the above-named children."

Pursuant to hearings on that petition, the court finally entered its order on August 2, 1960:

"That it is in the best interest of the children, F——, D—— and P——, that the parental rights be terminated and said children be placed with the Utah State Department of Public Welfare for the purpose of adoption. The matter to be reviewed on 7th day of February, 1961."

Thereafter on the 10th of September, 1960, the appellant filed her petition for restoration of custody of the children, alleging that she had secured a divorce from the children's father; that her physical and emotional health had been improved thereby; and that she was now able to properly care for them.[1] After further investigation and hearings pursuant to that petition the court made the order depriving appellant of custody, from which this appeal is taken.[2]

We are entirely in agreement with the presumption in which appellant seeks refuge that it is generally for the best interest and welfare of children to be reared under the care of their natural parents;[3] are appreciative of the mutual advantages to be found in the love, affection and interest which parents and children normally share with each other; and of the seeming harshness of allowing the law to step in and deprive them of these values. That the cutting of family ties is a step of the utmost gravity which should be done only for the most compelling reasons is not to be questioned.[4] This is even more true because doing so results in relieving the natural parents of the duty to support and care for their offspring and places the burden upon the state. Everyone will concede that this is undesirable, both socially and economically, and, therefore, to be avoided unless that is the only alternative to be found consistent with the best interests of the children.

Quite beyond and more important than the rights and privileges of the parents

---

1. Sec. 55-10-41, U.C.A.1953, provides for petition for return of custody by parents on the ground they have reformed or conditions have changed.
2. Sec. 55-10-34, U.C.A.1953, authorizes direct appeal to Supreme Court.
3. Walton v. Coffman, 110 Utah 1, 169 P. 2d 97; see also Baldwin v. Nielson, 110 Utah 172, 170 P.2d 179.
4. See State In the Interest of K—— B——, 7 Utah 2d 398, 326 P.2d 395, and authorities therein cited.

is the welfare of these children and their prospects for becoming well-adjusted, self-sustaining individuals. This is the consideration of paramount importance.[5] In appraising it, as is the case with most problems involving human beings and their relationships to each other, there are a number of factors, all of which should be taken into account and given weight according to their relative importance. This ought to be done on the long-range view, and not necessarily on what may appear to be for the immediate comfort or desires of the parties.

So closely related to considerations which will best serve the welfare of children as to be almost indistinguishable are the interests of the public, which also has a vital concern in the situation. In addition to the necessity of coming to the rescue of and supporting mistreated, dependent or neglected children, as has been true here, numerous other burdens are constantly emanating from maladjusted and deficient homes for society to bear. This need not be expatiated upon here, except to say that where there are limitations in natural endowments, it is even more unfortunate where this is combined with lack of environmental opportunity for correction and development.[6] In

such homes there is a strong potential to produce maladjusted, deficient individuals, who in turn produce homes of a similar character, which in their turn produce more such lives, from generation to generation.

■ Inasmuch as the public must bear these burdens, its functioning authorities are not required to always forebear in deference to the desires of persons incapable or unwilling to accept their own responsibilities. There is a point at which it is no longer consistent with the best interests of all concerned merely to continue picking up the wounded; and it becomes necessary to perform some social surgery to prevent a continuation of the evils that are producing the social harm. Doing so can, in the ultimate, best conserve human values and provide at least the hope of interrupting the self-perpetuating cycle of afflictions that fall upon the children and indirectly upon the public. Accordingly, the legislature has recognized that in cases where there is delinquency, dependency or neglect, deprivation of the parents of custody of the children is justified.[7] We agree that this is a drastic remedy which should be resorted to only in extreme cases and when it is manifest that the home itself cannot or will not correct the evils which exist.

5. See cases footnotes three and four above, and Baldwin v. Nielson, on Rehearing 110 Utah 180, 174 P.2d 437.
6. See article by Dr. Leon Eisenberg, American Journal of Orthopsychiatry, Vol. XXXII, No. 5 (Oct. 1962); The Individual Delinquent, by Dr. William Healy, Boston Little, Brown & Co. (1915).

7. Sec. 55-10-30, U.C.A.1953.

The record reflects that the Juvenile Judge was fully aware of the considerations discussed above and was gravely concerned with appellant's parental rights as well as with the welfare of these children. He exercised commendable zeal in an effort to become fully advised in the premises. Eight hearings were held between August 15, 1961, and January 30, 1962, at which evidence was introduced for both sides. This included the testimony of social workers and of Dr. Richard S. Iverson, a psychiatrist, the purport of all of which was to the effect that appellant was unable to care for her children. In order to be as assured as possible of the correct course of action, the Court ordered the appointment of another psychiatrist, Dr. Harvey P. Wheelwright, to make a further examination. The latter also testified in essence that due to appellant's mental deficiency and emotional instability she could not be expected to cope with any real problems in handling the children, such as the budgeting of money, or which would arise from sickness or other such difficulties, but in such situations would have to be completely dependent upon others.

It would serve no useful purpose to burden this opinion with further detail of the evidence; and because of appellant's limitations, it would undoubtedly be unfair to attach any moral blame to her conduct. It can be said in summary that it is clearly apparent that she has very little capacity to comprehend basic facts and correlate them to even the rudimentary aspects of practical affairs. She was unable to demonstrate any real understanding of what is necessary for the welfare of these children, or how much money it would take; or how it could be provided.

It is appropriate to observe that this proceeding, which has such a vital and permanent effect on the lives of those concerned, is not adversary in the usual sense, but is an inquiry into the welfare of the children; and is therefore equitable in the highest degree.[8] Due to this fact and to the somewhat informal manner in which such proceedings are conducted, the Juvenile Court has even more than the usual advantages[9] in judging the credibility of the witnesses, the personalities of the persons involved, and the correct solution to the problems confronted. For these reasons, and also because that court is staffed with judges and personnel who have special training, experience and interest in this field, and who are devoting their exclusive attention to such matters, it is proper to allow that court a wide latitude of discretion as to the judgments arrived at. Accordingly, it is the well-established rule that we will not disturb the findings and de-

8. See State in Interest of K—— B——, footnote four above.

9. Nokes v. Cont. Min. & Mill. Co., 6 Utah 2d 177, 308 P.2d 954.

**52**

termination made unless they are clearly against the weight of the evidence, or it is plainly manifest that the court has abused its discretion.[10] This is not shown here. On the contrary, there is ample basis in the record to support the court's conclusion that the interest and welfare of these children require the judgment as entered.

Affirmed. No costs awarded.

WADE, C. J., and HENRIOD, Mc-DONOUGH, and CALLISTER, JJ., concur.

10. State in Interest of K——— B———, footnote four above.