648 P.2d 1364 (1982)
In re J.P.
No. 17386.
Supreme Court of Utah.
June 9, 1982.
*1365 David L. Wilkinson, Atty. Gen., Sharon Peacock, Asst. Atty. Gen., Salt Lake City, for appellant.
Steven Kuhnhausen, Salt Lake City, for respondent.
OAKS, Justice:
In the Children's Rights Act, ch. 40, 1980 Utah Laws 288, amending U.C.A., 1953, § 78-3a-48(1), the Utah Legislature repealed the statutory provision allowing a court to "decree a termination of all parental rights" to a child on a finding that a parent is "unfit or incompetent by reason of conduct or condition seriously detrimental to the child," and substituted a provision permitting "involuntary termination" upon a finding that "such termination will be in *1366 the child's best interest." The sole question in this appeal is whether this new provision is constitutional under the Constitutions of Utah and the United States.
We emphasize at the outset that this case involves a permanent termination of all parental rights, not a question of which party shall have custody of a minor child for the time being.[1]
The record facts are scanty. On May 20, 1980, the Utah Division of Family Services (DFS) filed a petition with the juvenile court praying that the parental rights of the natural mother of J.P., then four years old, be terminated in the best interest of the child pursuant to U.C.A., 1953, § 78-3a-48(1), as amended. The mother filed a motion to dismiss the petition, alleging that the statute relied upon by DFS was unconstitutional. After a hearing, Presiding Judge Judith Whitmer granted the mother's motion to dismiss, holding the amended statute to be a violation of the mother's substantive right to "liberty, privacy, and family integrity" as guaranteed by the Ninth and Fourteenth Amendments to the United States Constitution, and void on its face for vagueness in contravention of procedural due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, § 7 of the Constitution of Utah. DFS has appealed. No other facts are before us. We have no inkling of the circumstances giving rise to the petition for termination of parental rights, since no evidentiary hearing was held.

I.

THE 1980 AND 1981 AMENDMENTS
The 1980 amendment to the Juvenile Court Act, U.C.A., 1953, § 78-3a-48(1), represents a major departure from the statutory and decisional law of this state, which has invariably upheld the rights of natural parents except in extreme circumstances.
The first compilation of statutory law after statehood gave a father and a mother the right to prevent the adoption of his or her child (with its concomitant termination of the parent's rights) unless the parent was "deprived of civil rights, or adjudged guilty of adultery, cruelty, or desertion, and for either cause divorced, or adjudged to be a habitual drunkard, or who has been judicially *1367 deprived of the custody of the child on account of cruelty, neglect, or desertion." R.S.Utah 1898 § 4. This solicitude for parental rights is reflected in our current adoption statutes, which permit the adoption of a child without a natural parent's consent only if that parent "has been judicially deprived of the custody of the child on account of cruelty, neglect, or desertion," or has abandoned the child. U.C.A., 1953, §§ 78-30-4, 78-30-5.
The Juvenile Court Act of 1965 empowered the juvenile court to terminate the rights of a natural parent (a) who was "unfit or incompetent by reason of conduct or condition seriously detrimental to the child," (b) who "abandoned the child," or (c) who "substantially and continuously or repeatedly refused or failed to give the child proper parental care and protection." U.C.A., 1953, § 78-3a-48, before amendment by Ch. 40, 1980 Utah Laws. As in the adoption statute, the rights of the parents were respected: No parent could be deprived of his or her parental rights without a prior showing of unfitness, abandonment, or substantial neglect. So long as a parent's conduct remained within those broad bounds, the state was not empowered to terminate the parent-child relationship.
As a counterweight to this concern for parental rights, this Court has consistently emphasized the interest of the state, as parens patriae, in children whose parents abuse them or do not adequately provide for their welfare. For example, in State in re F---- v. Dade, 14 Utah 2d 47, 376 P.2d 948 (1962), a leading pre-1965 case, a unanimous Court declared that "the cutting of family ties is a step of the utmost gravity which should be done only for the most compelling reasons... ." Nevertheless,
Quite beyond and more important than the rights and privileges of the parents is the welfare of these children and their prospects for becoming well-adjusted, self-sustaining individuals. This is the consideration of paramount importance.
14 Utah 2d at 49-50, 376 P.2d at 949-50. At the same time, the Court recognized the long-standing presumption "that it is generally for the best interest and welfare of children to be reared under the care of their natural parents." 14 Utah 2d at 49, 376 P.2d at 949.
After the enactment of the termination of parental rights provision of the Juvenile Court Act of 1965, the Court continued to uphold the natural and legal right of parents while stressing the strong interest of the state in protecting children whose parents are unfit and who suffer serious detriment as a result. For example, in State in re Jennings, 20 Utah 2d 50, 52, 432 P.2d 879, 880 (1967), this Court stated:
While ordinarily the parents have a right to the custody of their children, the State has an interest in the welfare of the children which is paramount thereto. It goes beyond the natural right and authority of the parent to the child's custody, and so children may be taken away from parents in proper circumstances.
We have been willing to uphold the termination of parental rights when circumstances clearly showed that the condition or conduct of the parents exceeded the natural and legal limits of parental discretion. State in re Mullen, 29 Utah 2d 376, 510 P.2d 531 (1973) (father brutally killed wife in presence of children); State in re S---- J----, Utah, 576 P.2d 1280 (1978) (parents suffering from "acute alcoholism," and had done nothing when daughter was sexually molested in their presence); State in re R---- J----, Utah, 589 P.2d 244 (1978) (father suffered "severe personality disturbance," had attempted suicide on two occasions, had assaulted children on numerous occasions; mother, a deaf mute with brain damage or schizophrenia, was "unable to deal with concepts such as `good and bad'"); Adoption of McKinstray v. McKinstray, Utah, 628 P.2d 1286 (1981) (father who had not provided child support or contacted children for over six years held to have abandoned them); State in re Orgill v. Thomason, Utah, 636 P.2d 1075 (1981) (mother who had not contacted children for *1368 over six years held to have abandoned them).
In short, both before and after the Juvenile Court Act of 1965, this Court has recognized the limits of the "natural right and authority of the parent" and the importance of considering the interests of the child.
Against this statutory and decisional history, the 1980 Legislature enacted a statute entitled "Children's Rights." Ch. 40, 1980 Utah Laws 288. In addition to making some minor editorial improvements in the statute, which are not challenged here, this Act deleted from U.C.A., 1953, § 78-3a-48(1) all reference to parental unfitness and empowered the juvenile court to order an "involuntary termination" of all parental rights of one or both parents upon a finding
(a) That such termination will be in the child's best interest. In determining the child's best interest the court shall consider, but is not limited to, the following circumstances:
(i) The willingness of the parent or parents to receive or care for the child;
(ii) That the child has been removed from the custody of the parent by temporary order of the court for a period of six months and further finds that:
(A) The conditions which led to the removal still exist;
(B) There is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future; and
(C) The continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home... .
As amended in 1980, the statute makes no reference to the right of a fit, competent parent to continue the parent-child relationship. On the contrary, it suggests that if, after "considering" certain specified factors, the juvenile court concludes that the "child's best interest" will be served by terminating the parent's rights, the parent can be stripped of her rights without any showing of wrongdoing or unfitness on her part.[2]
In its brief, the State attempts to minimize the legal change wrought by the 1980 amendment. While we agree with the State's explanation that "the best interests of a child are served by a fit parent, and a fit parent will serve the best interests of the child," we cannot join the State in its conclusion that "any distinction [between the best interest and unfitness standards] is a mere matter of semantics," and consequently that "any concern over the new standard is unfounded." On the contrary, the 1980 amendment did not merely refine or elaborate the requirement that a parent be found "unfit or incompetent" in order to terminate his or her parental rights. Instead, it replaced that subsection, and in doing so deleted a statutory protection for the parental rights of fit parents.
The 1980 amendment's substitution of "the child's best interest" as the governing standard for termination does not provide equivalent protection for parental rights. The best interest of the child has always been a paramount or "polar star" principle in cases involving termination of parental rights, but it has not been the sole criterion. It is a vital ingredient in a determination that has at least two elements in sequence. Similarly, West Virginia's highest court described the two elements in its parental rights termination law as follows:
[O]nce a court exercising proper jurisdiction has made a determination upon sufficient proof that a child has been neglected and his natural parents were so derelict in their duties as to be unfit, the welfare of the infant is the polar star by *1369 which the discretion of the court is to be guided in making its award of legal custody.
In re Willis, 157 W. Va. 225, 207 S.E.2d 129, 140-41 (1973). But, the court cautioned later in its opinion, "No court is warranted in applying the `polar star principle' [of welfare of the infant] until the natural parents' rights have been lawfully severed and terminated." Id. 207 S.E.2d at 142.
Similarly, we cannot concur with the State that "the amended statute simply incorporates and authorizes" this Court's decisions emphasizing the child's best interest. It is a serious misreading of our decisions to suppose that they show no more concern for the rights of parents than does the 1980 amendment. Writing for a unanimous court, Justice Crockett recently explained:
It is true that in controversies involving the well-being of children, this Court and others have frequently said that the best interest of the children is of paramount importance... . [W]e are not aware that this Court has ever espoused the view, and it is not our view, that the termination of parental rights can be decreed without giving serious consideration to the prior and fundamental right of a parent to rear his child; and concomitantly, of the right of the child to be reared by his natural parent.
In re Castillo, Utah, 632 P.2d 855, 856 (1981).
Section 78-3a-48(1)(a) was again amended effective May 12, 1981, after briefs were filed in this appeal.[3] Children's Rights Act, ch. 157, 1981 Utah Laws 932. The 1981 amendment is not the sort of legislation for which this Court finds an exception to the statutory rule of construction that no statute "is retroactive, unless expressly so declared." U.C.A., 1953, § 68-3-3.[4] But even if it were, that fact would not alter our analysis of § 78-3a-48(1)(a).
*1370 The 1981 amendment did not alter the governing standard of the subsection  that the child's best interest is the standard governing the termination of parental rights  but merely added seven circumstances to be considered by the court in determining the child's best interest. Although at least four of the seven are cast in terms of parental fault or incapacity, U.C.A., 1953, § 78-3a-48(1)(a)(i)-(iv) (Supp. 1981), the section as a whole permits the termination of a parent's rights without reference to even one of those four circumstances, and thus without a showing of parental unfitness or even fault. Consequently, on the question of the constitutionality of the best interest standard, the 1980 and 1981 amendments stand on equal footing.
In conclusion, by substituting the best interest of the child for the unfitness of parents as the governing standard, the 1980 amendment  even as improved in 1981  markedly diluted the protection enjoyed by natural parents threatened with the termination of their parental rights. We must therefore consider the constitutionality of that change.

II.

THE QUESTION OF MOOTNESS
Neither party has suggested that the changes effected by the 1981 amendment made this appeal moot. Indeed, the State observed in oral argument that the 1981 amendment did not moot this appeal. Nevertheless, the dissent now takes that position, and advocates remanding the case at this late date to redetermine the petition for termination of parental rights under the statute as amended in 1981. That further delay is inadvisable for the parties and unnecessary under the law.
This appeal is not moot for the reasons discussed in the preceding section: The 1981 amendment is not retroactive, and in any case did not change the basic "child's best interest" standard governing the termination of parental rights under the 1980 amendment or restore explicit recognition of the parental rights that had been displaced by the 1980 amendment. The 1981 amendment only added additional circumstances to be considered in determining the child's best interest.
An amendment to a statute under consideration on appeal does not automatically moot the appeal. It does so only when the amendment actually prevents the requested judicial relief from affecting the rights of the litigants. Duran v. Morris, Utah, 635 P.2d 43, 45 (1981). The statute as amended in 1980 was assailed on two grounds, as void for vagueness and as violative of parental rights. By making the statute more specific, the 1981 amendment, if retroactively applied, might have mooted the issue of vagueness. The dissent, which focuses principally on the vagueness challenge, relies on that possibility. But the 1981 amendment did not alter the controlling standard that had been adopted in 1980, which in effect allows parental rights to be terminated upon a showing that doing so would be in the child's best interest, without any showing of parental unfitness, abandonment, or substantial neglect. Since the important issue of the constitutionality of the 1980 amendment's substituting child's best interest for parental rights continues *1371 under the 1981 amendment, a decision on that ground will still affect the rights of the litigants. The appeal is therefore not moot. (The indirect effect of our ruling on the 1981 amendment is discussed in note 14.)
Even if the question of the constitutionality of the 1980 amendment were moot, the special circumstances of this litigation and the cases dependent upon it would permit us to rule on the question under the exceptions to mootness. In our leading case on this question, we declared:
The principles that determine the justiciability of the instant case are the well-established rules which permit a court to litigate an issue which, although technically moot as to a particular litigant at the time of appeal, is of wide concern, affects the public interest, is likely to recur in a similar manner, and, because of the brief time any one person is affected, would otherwise likely escape judicial review... . [Emphasis added.]
Wickham v. Fisher, Utah, 629 P.2d 896, 899 (1981). The emphasized criteria apply with at least as much force to the children affected by this litigation as to the class of adults (prisoners) affected by the outcome of the Wickham case. The final factor  brief time of effect  is not present in this case, but an equivalent criteria is present. If every minor amendment of legislation would moot litigation challenging its constitutionality, it would be possible for the action of the Legislature to have the effect of preventing or postponing indefinitely judicial review of a basic legislative measure by means of a succession of minor amendments enacted before each appeal could be concluded. While there is no suggestion that the 1981 amendments were motivated by that purpose, the mootness interpretation urged by the dissent would permit such evasion.
In Diffenderfer v. Central Baptist Church of Miami, Florida, Inc., 404 U.S. 412, 92 S.Ct. 574, 30 L.Ed.2d 567 (1971), the United States Supreme Court, in reasoning that the case before it was no longer a "present, live controversy," stated: "This is not a case that is `capable of repetition, yet evading review,' nor is it the kind of case that may produce irreparable injury if not decided immediately." 404 U.S. at 414, 92 S.Ct. at 575 (citations omitted). The case before us is precisely one which, if not resolved on this appeal, will produce manifestly irreparable injury, not only to the child concerning whom this particular dispute arose, but to many others similarly situated.
The child involved in this petition was four years of age when the petition was filed. She is now six. Before this case could be resolved on remand, with a possible further appeal to this Court, she would probably be at least eight years of age. She cannot be adopted or otherwise established in a permanent family relationship until the important question posed in this case is resolved.
At the time of oral argument in this case, the State informed this Court that court records would disclose that as of that date every petition for the termination of parental rights known to counsel had been continued pending the outcome of this appeal. Indeed, for almost a year prior to that time no such petitions had been filed because the juvenile court had held the statute unconstitutional in this case. Counsel stated:
I would also request that the court make a prompt decision of this question because it has been a very long time since we've been able to do anything under any Act toward the termination of parental rights, and there are a lot of children, well over twenty in Salt Lake County alone, who are simply waiting for these petitions to be filed.
A court cannot stay the formation or deepening of emotional ties between children and foster parents or the current pain of separation and uncertainty suffered by all who are interested in a proposed termination of parental rights. It would be unacceptable for us to leave children suspended *1372 in emotional limbo by remanding for further proceedings certain to produce additional delay and likely to produce an outcome no different from the one we achieve by addressing the constitutional question in the present appeal.
In sum, the 1981 amendment does not moot this appeal on the constitutionality of the 1980 amendment, and even if it did, this case would present an exceptional circumstance permitting us to rule on the merits.

III.

THE CONSTITUTIONAL RIGHT OF PARENTS
This Court has recently declared that "the ideals of individual liberty which ... protect the sanctity of one's home and family" are "essential in a free society... ." In re Castillo, Utah, 632 P.2d 855, 856 (1981). A parent has a "fundamental right, protected by the Constitution, to sustain his relationship with his child." State in re Walter B., Utah, 577 P.2d 119, 124 (1978) (plurality opinion). It is fundamental to our jurisprudence that "the custody, care and nurture of the child reside first in the parents," Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944), and that the parents' right "to direct the upbringing and education of children under their control," Pierce v. Society of Sisters, 268 U.S. 510, 534-35, 45 S.Ct. 571, 573-74, 69 L.Ed. 1070 (1925), is protected by the Constitution. In Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), the Supreme Court included family relationships in the "liberty" of which a state cannot deprive any person without due process of law under the Fourteenth Amendment to the United States Constitution:
While this Court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual ... to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.
As it noted in a recent opinion, the United States Supreme Court has now "recognized on numerous occasions that the relationship between parent and child is constitutionally protected." Quilloin v. Walcott, 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978). For example, in Santosky v. Kramer, ___ U.S. ___, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982), the majority refers to the "fundamental liberty interest of natural parents in the care, custody, and management of their child...." The Court was unanimous on this point. The four justices who dissented emphasized that they did not disagree "with the majority's conclusion that the interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment." Id. 102 S.Ct. at 1405.
We deal here with a fundamental principle. The Constitution of Utah declares, "Frequent recurrence to fundamental principles is essential to the security of individual rights and the perpetuity of free government." Article I, § 27. The cornerstone of democratic government is the conviction that governments exist at the sufferance of the people, in whom "[a]ll political power is inherent... ." Utah Const. Art. I, § 2. A residuum of liberty reposes in the people. That liberty is not limited to the exercise of rights specifically enumerated in either the United States or the Utah Constitutions. Thus, Article I, § 25 of the Utah Constitution states, "This enumeration of rights shall not be construed to impair or deny others retained by the people." The Ninth Amendment to the United States Constitution states, "The enumeration in the Constitution, of certain rights, shall not be construed *1373 to deny or disparage others retained by the people." See generally Griswold v. Connecticut, 381 U.S. 479, 486-99, 85 S.Ct. 1678, 1682-90, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring); L. Tribe, American Constitutional Law, § 11-3 (1978).
The rights inherent in family relationships  husband-wife, parent-child, and sibling  are the most obvious examples of rights retained by the people. They are "natural," "intrinsic," or "prior" in the sense that our Constitutions presuppose them, as they presuppose the right to own and dispose of property. Decisions of the United States Supreme Court have declared that "[t]he freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men." Loving v. Virginia, 388 U.S. 1, 12, 87 S.Ct. 1817, 1823-24, 18 L.Ed.2d 1010 (1967). See also Zablocki v. Redhail, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). Similarly, the Court has characterized the right to procreate as among the "basic civil rights of man." Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942). Blackstone deemed "the most universal relation in nature ... [to be] that between parent and child." 1 W. Blackstone, Commentaries * 446.
The integrity of the family and the parents' inherent right and authority to rear their own children have been recognized as fundamental axioms of Anglo-American culture, presupposed by all our social, political, and legal institutions. "To protect the [individual] in his constitutionally guaranteed right to form and preserve the family is one of the basic principles for which organized government is established... ." Lacher v. Venus, 177 Wis. 558, 569, 188 N.W. 613, 617, 24 A.L.R. 403, 409 (1922). "The family is the basis of our society." In re Guardianship of Faust, 239 Miss. 299, 307, 123 So.2d 218, 221 (1960). "The family entity is the core element upon which modern civilization is founded." In re Luscier, 84 Wash.2d 135, 136, 524 P.2d 906, 907 (1974). Accord Matarese v. Matarese, 47 R.I. 131, 132-33, 131 A. 198, 199, 42 A.L.R. 1360, 1361 (1925); Gilmore v. Kitson, 165 Ind. 402, 410, 74 N.E. 1083, 1085 (1905). "This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." Wisconsin v. Yoder, 406 U.S. 205, 232, 92 S.Ct. 1526, 1541, 32 L.Ed.2d 15 (1972).
This parental right transcends all property and economic rights. It is rooted not in state or federal statutory or constitutional law, to which it is logically and chronologically prior, but in nature and human instinct. Thus, the United States Supreme Court has declared that "the liberty interest in family privacy has its source ... in intrinsic human rights... ." Smith v. Organization of Foster Families, 431 U.S. 816, 845, 97 S.Ct. 2094, 2110, 53 L.Ed.2d 14 (1977). The New York Court of Appeals applied that concept in unanimously rejecting the state's attempts to deprive a mother of the custody of her children on the basis of her engaging in conduct that was politically and socially unpopular.
No court can, for any but the gravest of reasons, transfer a child from its natural parent to any other person, [authorities cited], since the right of a parent, under natural law, to establish a home and bring up children is a fundamental one and beyond the reach of any court. [Emphasis added.]
People ex rel. Portnoy v. Strasser, 303 N.Y. 539, 542, 104 N.E.2d 895, 896 (1952). Similarly, this Court has stated that the parent's right, as well as duty, to care for a child "may be termed natural, as well as legal and moral." Mill v. Brown, 31 Utah 473, 483, 88 P. 609, 613 (1907). More recently, this Court has spoken of "the natural right and authority of the parent to the child's custody," State in re Jennings, 20 Utah 2d 50, 52, 432 P.2d 879, 880 (1967), and of "the prior and fundamental right of a parent to *1374 rear his child ..." In re Castillo, 632 P.2d at 856.[5]
In Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972), the United States Supreme Court summarized the legal effect of these conclusions that the rights embodied in family relationships are inherent, natural, and retained rights as follows: "The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Ninth Amendment." (Emphasis added; citations omitted.)

IV.

THE CONSTITUTIONALITY OF THE STATUTE
The question on this appeal is whether a statute authorizing the juvenile court to "decree an involuntary termination of all parental rights" solely on the basis of a finding that "such termination will be in the child's best interest" violates the parent's constitutionally protected rights. We hold that it does.
In Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), three children born out of wedlock had been declared wards of the state upon their mother's death and placed with court-appointed guardians pursuant to state statute. The father, who had lived with the mother and children intermittently for 18 years, challenged this action. The United States Supreme Court sustained his parental rights, holding that the Illinois statute presuming unwed fathers to be unfit was a violation of the due process clause. The Court explained its holding as follows: "The private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection." Id. at 651, 92 S.Ct. at 1212. Since the "State's interest in caring for [the father's] children is de minimis if [he] is shown to be a fit father," id. at 657-58, 92 S.Ct. at 1215-1216, the conclusion is inescapable that the Court found a showing of unfitness to be a prerequisite to the severing of parental ties. A statutory presumption based on the father's failure to marry the children's mother was insufficient; the due process clause required proof of some degree of unfitness.[6]
Six years later, in Quilloin v. Walcott, 434 U.S. 246, 255, 98 S.Ct. 549, 555, 54 L.Ed.2d 511 (1978), a unanimous United States Supreme Court underlined the constitutional inadequacy of a "child's best interest" finding as a means of overriding the constitutional right of parents who have not been shown to be unfit:
We have little doubt that the Due Process Clause would be offended "[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest."[7]
Under Stanley and Quilloin, parents in different circumstances are apparently entitled to different degrees of protection for their parental rights. Parental rights are at their apex for parents who are married. Some variation exists among unwed fathers. *1375 While those who have fulfilled a parental role over a considerable period of time are entitled to a high degree of protection, Stanley v. Illinois, supra, unwed fathers whose relationships to their children are merely biological or very attenuated may, in some circumstances, be deprived of their parental status merely on the basis of a finding of the "best interest" of the child. Quilloin v. Walcott, supra.[8] In contrast, no similar variation exists among mothers who are unwed, such as the mother in this case; all unwed mothers are entitled to a showing of unfitness before being involuntarily deprived of their parental rights.[9]
Stanley v. Illinois, supra, and Quilloin v. Walcott, supra, demonstrate that the termination of parental rights solely on the basis of the child's best interest and without any finding of parental unfitness, abandonment, or substantial neglect, violates the parent's liberty rights under the due process clause of the United States Constitution.[10] Unlike substantive due process cases like Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 34 L.Ed.2d 147 (1973), which rely on a "right of privacy" not mentioned in the Constitution to establish other rights unknown at common law, the parental liberty right at issue in this case is fundamental to the existence of the institution of the family, which is "deeply rooted in this Nation's history and tradition," Moore v. City of East Cleveland, 431 U.S. 494, 503, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977) (plurality opinion), and in the "history and culture of Western civilization." Wisconsin v. Yoder, 406 U.S. 205, 232, 92 S.Ct. 1526, 1541, 32 L.Ed.2d 15 (1972). See also W. Tiffany, The Law of Persons and Domestic Relations 268-70 (2d ed. 1909); 2 J. Kent, Commentaries * 205; 1 W. Blackstone, Commentaries * 452-53. This rooting in history and the common law validates and limits the due process protection afforded parental rights, in contrast to substantive due process innovations undisciplined by any but abstract formulae. Moore v. City of East Cleveland, 431 U.S. at 503 n. 12, 97 S.Ct. at 1938 n. 12.
By the same token, we conclude that the right of a parent not to be deprived of parental rights without a showing of unfitness, abandonment, or substantial neglect is so fundamental to our society and so basic to our constitutional order (see the authorities quoted in Part III of this opinion) that it ranks among those rights referred to in Article I, § 25 of the Utah Constitution and the Ninth Amendment of the United States Constitution as being retained by the people.
This recognition of the due process and retained rights of parents promotes values *1376 essential to the preservation of human freedom and dignity and to the perpetuation of our democratic society. The family is a principal conservator and transmitter of cherished values and traditions. See Moore v. City of East Cleveland, 431 U.S. 494, 503-04, 97 S.Ct. 1932, 1937-38, 52 L.Ed.2d 531 (1977). Any invasion of the sanctity of the family, even with the loftiest motives, unavoidably threatens those traditions and values.
For example, family autonomy helps to assure the diversity characteristic of a free society. There is no surer way to preserve pluralism than to allow parents maximum latitude in rearing their own children. Much of the rich variety in American culture has been transmitted from generation to generation by determined parents who were acting against the best interest of their children, as defined by official dogma. Conversely, there is no surer way to threaten pluralism than to terminate the rights of parents who contradict officially approved values imposed by reformers empowered to determine what is in the "best interest" of someone else's child.
Urging that there is no difference between the standard of "the child's best interest" and the "unfitness of the parent" in parental termination cases, the State's brief refers us to our statement in State in re P.L.L., Utah, 597 P.2d 886, 888-89 (1979), that "children require more than basic survival care; they also require and deserve at least some degree of intellectual, emotional, and social stimulation... ." However, that statement, which we reaffirm, falls far short of providing justification for severing the ties between parents and their children because "the child's best interest" will be better served by the intellectual, emotional, and social stimulation a substitute parent or set of parents will be able to provide. To allow a court to decide who can best provide a child intellectual stimulation could chill the propagation and perpetuation of disfavored political, philosophical, and religious views within the privacy of the family circle. Unlike the standard of "parental fitness," which imposes a high burden on the state in an adversary proceeding, the standard of "best interest" of the child provides an open invitation to trample on individual rights through trendy redefinitions and administrative or judicial abuse.[11] We do not suggest that any evil motives are at work here, but only that, as James Madison wrote in a similar context, "it is proper to take alarm at the first experiment on our liberties." Memorial and Remonstrance Against Religious Assessments, 8 The Papers of James Madison 298, 300 (Rutland & Rachal ed. 1973).
Finally, this recognition of the inherent and retained rights involved in family relationships protects freedoms, relationships, and values that many citizens consider as fundamental to the purpose and enjoyment of life as the freedoms of speech and press are to the preservation of our political order. In the words of one family scholar:
Men and women in most cultures have long viewed their offspring as somehow being an extension of themselves, and as more than mere "property." The bearing and raising of children has probably brought people into contact with some sense of the Infinite, the mysteries of the universe, or Nature  however one may express it  more than any other human experience. Thus, it is not surprising that common law judges refer to parental interests as "sacred," "natural," or "fundamental" rights, especially when the constitutional standard for a "fundamental" right is whatever judges find when *1377 they "look to the `traditions and [collective] conscience of our people' to determine whether a principle is `so rooted [there] ... as to be ranked as fundamental.' The inquiry is whether a right involved `is of such character that it cannot be denied without violating those "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions" ...'"[12]
B. Hafen, "Children's Liberation and the New Egalitarianism: Some Reservations About Abandoning Youth to Their `Rights,'" 1976 B.Y.U.L.Rev. 605, 628 (footnotes omitted).
For the reasons and upon the precedents discussed above, we conclude that the Utah Constitution recognizes and protects the inherent and retained right of a parent to maintain parental ties to his or her child under Article I, § 7 and § 25, and that the United States Constitution recognizes and protects the same right under the Ninth and Fourteenth Amendments. We further conclude that, under both Constitutions, a mother is entitled to a showing of unfitness, abandonment, or substantial neglect before her parental rights are terminated. Since the 1980 amendment to U.C.A., 1953, § 78-3a-48(1) makes no provision for that showing, it is unconstitutional on its face.

V.

THE EFFECT OF THIS DECISION
We do not suggest that the Constitution relegates a child to the status of a mere chattel, to be treated or mistreated by his or her parents according to their pleasure. Consistent with all the principles discussed above, a parent shown by clear and convincing evidence to be unfit, abandoning, or substantially neglectful can be permanently deprived of all parental rights. Santosky v. Kramer, ___ U.S. ___, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); Stanley v. Illinois, 405 U.S. at 652, 92 S.Ct. at 1213; Parham v. J.R., 442 U.S. 584, 603 (1979). For example, in State in re R---- J----, Utah, 589 P.2d 244, 245 (1978), after setting forth the "unfit or incompetent" passage of the 1965 statute, we stated:
Although courts are reluctant to perform social surgery in permanently terminating the natural parent-child relationship, the welfare of the child is the paramount consideration.
We perceive no incompatibility between the parental rights defined in the present case and the principle that the child's welfare is the "paramount consideration." That principle does not imply that the child's welfare is the sole consideration, to the exclusion of parental rights, nor that a parent's interest is entitled only to the weight it may incidentally receive under the presumption that parental ties are beneficial to the child's welfare. The principle that "the welfare of the child is the paramount consideration" means that parental rights, though inherent and retained, are not absolute; that the state, as parens patriae, has the authority and obligation to assume a parental role after the natural parent has been shown to be unfit or dysfunctional; and that parental prerogatives cannot, at that extreme point, frustrate the state in discharging its duty. Santosky v. Kramer, ___ U.S. ___, 102 S.Ct. 1388, 1401 n. 17, 71 L.Ed.2d 599 (1982); Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944); 3 W. Blackstone, Commentaries * 47; "Developments in the Law  The Constitution and the Family," 93 Harv.L.Rev. 1156, 1221-42 (1980).[13]
The 1980 amendment to U.C.A., 1953, § 78-3a-48(1), which substituted a *1378 finding of "the child's best interest" for a finding that a parent is "unfit or incompetent" as a basis for the involuntary termination of parental rights, being unconstitutional under both the Utah and the United States Constitutions, and the petition containing no allegations pertaining to the unfitness, abandonment, or substantial neglect of the parent pursuant to § 78-3a-48(1) of the unamended statute, the juvenile court properly granted the mother's motion to dismiss. The court's decree is therefore affirmed.[14] This disposition makes it unnecessary for us to rule on the juvenile court's holding that the amended statute is also void for vagueness.
Affirmed.
HALL, C.J., HOWE, J., and J. ALLAN CROCKETT, Retired Justice, concur.
DURHAM, J., did not participate herein.
STEWART, Justice (dissenting):
I agree with the view of the majority that the family unit and the relationship of parents and children are constitutionally protected. However, in holding two different statutes  one of which is not even before the Court and whose constitutionality has been assailed by no one  unconstitutional, the Court, in my view, transgresses fundamental principles limiting the power of the Court to declare acts of the Legislature null and void. I respectfully submit that the first statute, the Children's Rights Act of 1980 (the 1980 Act) is moot by virtue of the 1981 amendment to that Act (the 1981 Act) and that the constitutionality of the 1981 Act should not be ruled on because the issue of the validity of that Act is not before the Court.
On this appeal, this Court was asked to adjudicate the constitutionality of the 1980 Act only. The 1981 Act was not briefed or argued, and the Court has not asked for any such briefing. Nevertheless, the Court reaches out and holds the 1981 statute unconstitutional on its face, sua sponte, without submission of the issue by any party. I disagree not only with the procedure, but also with the conclusion that the 1981 Act is unconstitutional, assuming it is permissible to reach the merits of that Act. The 1980 and 1981 Acts are patently dissimilar, and a constitutional adjudication as to the 1980 Act does not control the 1981 Act or provide any basis for the Court's reaching that Act and holding it unconstitutional. Moreover, by ruling on the 1981 Act now, the Court risks the likely undoing of adjudications based on that Act and further upheaval and insecurity to children and adults in cases tried under that Act. Because of the *1379 Court's sweeping ruling, it now appears that all such cases may be clouded without any of the parties having had a day in court on the constitutionality of that Act.
It is a well-settled, long-standing rule that courts should not anticipate a constitutional issue in advance of the necessity of deciding it. State v. Wood, Utah, 648 P.2d 71 (1982); Hoyle v. Monson, Utah, 606 P.2d 240 (1980); Martineau v. Crabbe, 46 Utah 327, 150 P. 301 (1915); Clay v. Sun Insurance Office Ltd., 363 U.S. 207, 80 S.Ct. 1222, 4 L.Ed.2d 1170 (1960); United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960); Peters v. Hobby, 349 U.S. 331, 75 S.Ct. 790, 99 L.Ed. 1129 (1955). Even more fundamental is the axiom that this Court should not render an opinion on a moot question, yet that is what the majority does, in my view, in holding the 1980 statute unconstitutional when the Legislature in 1981 repealed that part of the 1980 Act which the Court finds invalid. Adjudicating the constitutionality of an already repealed statute is to decide a moot question. Concerned Parents v. Mitchell, Utah, 645 P.2d 629 (1982); Diffenderfer v. Central Baptist Church, 404 U.S. 412, 92 S.Ct. 574, 30 L.Ed.2d 567 (1972).
The Court argues that the controversy as to the 1980 statute is not moot under the doctrine of Wickham v. Fisher, Utah, 629 P.2d 896 (1981) because the controversy as to the 1980 Act will likely recur but escape review. How that can possibly be so in this case, the majority does not explain. I submit it is unexplainable. The doctrine of Wickham v. Fisher just does not apply in this case.
Furthermore, the majority's contention that the viability of the issue of the constitutionality of the "child's best interest" standard remains because that standard is retained by the 1981 Act, is to ignore the substantial changes made by the Legislature in the 1981 Act which, I believe, make the child's best interest depend upon a demonstration of parental unfitness. So construed, the 1981 Act, at least on its face, is in conformity with constitutional principles  not just those controlling vagueness, but also those substantive standards governing the integrity of the parent-child relationship.
Contrary to the majority's position, the 1980 and 1981 Acts are, on their face, significantly different. Section 78-3a-48(1), as enacted in 1980, provides:
The court may decree an involuntary termination of all parental rights with respect to one or both parents if the court finds either (a), (b), or (c) as follows:
(a) That such termination will be in the child's best interest. In determining the child's best interest the court shall consider, but is not limited to, the following circumstances:
(i) The willingness of the parent or parents to receive or care for the child;
(ii) That the child has been removed from the custody of the parent by temporary order of the court for a period of six months and further finds that:
(A) The conditions which led to the removal still exist;
(B) There is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future; and
(C) The continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home;
(b) That the parent or parents have abandoned the child. It shall be prima facie evidence of abandonment that the parent or parents, although having legal custody of the child, have surrendered physical custody of the child, and for a period of six months following such surrender have not manifested to the child or to the person having the physical custody of the child a firm intention to resume physical custody or to make arrangements for the care of the child; or
(c) That after a period of trial, during which the child was left in his own home *1380 under protective supervision or probation, or during which the child was returned to live in his own home, the parent or parents substantially and continuously or repeatedly refused or failed to give the child proper parental care and protection. [Emphasis added.]
I recognize that a court could terminate a parent's rights under paragraph (a) of that statute solely on a completely unrestricted "best interest test" because the court, under the plain meaning of the statute, is not limited to determining the best interest in light of the specific standards set out in the statute; and even if a court were so limited, those standards do not satisfy constitutional requirements. The highly objectionable consequence is that a court may for all practical purposes make the determination of a child's best interest pursuant to any transient ideology or any other standard a court may deem appropriate for determining how children should be reared. The statute expressly states that a court need only consider the statutory standards "but is not limited to" them. Such vagueness results in depriving both parents and children of the constitutional protection to which they are entitled.
When the Legislature addressed the whole issue anew in 1981, it deleted the phrase "but not limited to," and in effect confined the meaning of the term "best interests of the child" to those standards set out in the new statute. As amended in 1981, § 78-3a-48(1), with deletions and additions as indicated, now reads as follows:
The court may decree an involuntary termination of all parental rights with respect to one or both parents if the court finds either (a), (b), or (c) as follows:
(a) That such termination will be in the child's best interest. In determining the child's best interest the court shall consider, but is not limited to, the following circumstances:
(i) The willingness of the parent or parents to receive or care for the child; Repeated conduct of the parent toward a child resulting in the serious neglect or abuse of the child;
(ii) Emotional illness, mental illness and mental deficiency of the parent, of such nature and extent as to render the parent unable for a reasonable period in the future to care for the physical, mental and emotional needs of the child;
(iii) Excessive and repeated use of intoxicating liquors or narcotics or dangerous drugs by the parent with little likelihood of change;
(iv) Legal determination of the parent as a habitual felon;
(v) Unexplained serious injury or death of a sibling of the child;
(vi) Whether reasonable efforts by appropriate public or private child caring agencies have been made to rehabilitate the family;
(vii) The reasonable preference of the child, if the court deems the child of sufficient capacity to express a preference;
(ii) (viii) That If the child has been removed from the custody of the parent by temporary order of the court for a period of six consecutive months and the court further finds that:
(A) The conditions which led to the removal still exist;
(B) There is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future; and
(C) The continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home;
(b) That the parent or parents have abandoned the child. It shall be prima facie evidence of abandonment that the parent or parents, although having legal custody of the child, have surrendered physical custody of the child, and for a period of six months following such surrender have not manifested to the child or to the person having the physical custody *1381 of the child a firm intention to resume physical custody or to make arrangements for the care of the child; or
(c) That after a period of trial, during which the child was left in his own home under protective supervision or probation, or during which the child was returned to live in his own home, the parent or parents substantially and continuously or repeatedly refused or failed to give the child proper parental care and protection.
By deleting the words, "but is not limited to," the Legislature obviously intended that the criteria enumerated in the subparagraphs under paragraph (a) should guide the determination of what is in the child's best interest. Thus, the statute now requires that an adjudication of termination be made on the basis of the eight standards enumerated under paragraph (a), or under the provisions of paragraph (b) or (c), neither of which is in issue here. The term "child's best interest" appears only in paragraph (a); but the content of that term is found in, and defined by, the standards found in the subparagraphs of that paragraph.
As I read the statute, six of the eight subparagraphs under paragraph (a) require fault, unfitness, or injurious conduct toward the child on the part of the parent. The other two, the preference of the child and the efforts made to rehabilitate the family, were clearly intended to be factors which could be considered along with one or more of the fault factors. Neither of those two factors could reasonably be the basis for a termination; on the contrary, they presuppose the existence of one or more of the "fault" factors.
Because the term "child's best interest" is confined to, and dependent upon, the specific standards enumerated, it is inaccurate, in my view, for the Court to state that "[t]he 1981 amendment did not alter the governing standard of the subsection  that the child's best interest is the standard in the termination of parental rights  but merely added seven circumstances to be considered by the court in determining the child's best interest." For the same reason, I think it inaccurate to state that "on the question of the constitutionality of the best interest standard, the 1980 and 1981 amendments stand on equal footing." In all events, if there is doubt as to the constitutionality of the 1981 Act, we are constrained to construe it to avoid constitutional pitfalls. In re Boyer, Utah, 636 P.2d 1085 (1981).
This Court has always been of the view that family units are the indispensable building blocks of civilized society and that parents have the inherent right to rear their children and be protected from improper state intervention. Only when the well-being of a child is threatened may the state interpose itself between parent and child. The state may never do so to promote some orthodoxy of thought. But once the welfare of the child is threatened, it is the child's welfare, not the interest of the parents, which predominates. This fundamental principle is adequately protected by the 1981 Act.
Even in cases under the 1965 statute, which the Court now reinstates, and earlier statutes, this Court has repeatedly stated that the welfare of the child in termination proceedings is paramount to the rights of the parents. In re R---- J----, Utah, 589 P.2d 244 (1978); In re A., 30 Utah 2d 131, 514 P.2d 797 (1973); State v. Lance, 23 Utah 2d 407, 464 P.2d 395 (1970); In re Jennings, 20 Utah 2d 50, 432 P.2d 879 (1967); State v. Dade, 14 Utah 2d 47, 376 P.2d 948 (1962); In re Adoption of D, 122 Utah 525, 252 P.2d 223 (1953); In re Olson, 111 Utah 365, 180 P.2d 210 (1947); Walton v. Coffman, 110 Utah 1, 169 P.2d 97 (1946). In In re Jennings, 20 Utah 2d at 52, 432 P.2d at 880 (1967), this Court observed that the welfare of children "goes beyond the natural right and authority of the parent to the child's custody." In State v. Dade, 14 Utah 2d at 49-50, 376 P.2d at 948-949 (1962), this Court stated:
Quite beyond and more important than the rights and privileges of the parents is *1382 the welfare of these children and their prospects for becoming well-adjusted, self-sustaining individuals. This is the consideration of paramount importance.
What our cases prior to 1980 add up to is that parental rights are dependent upon the performance of the duties of parents toward their children. Children do have a legal, moral, and even a biological claim to the performance of those duties by their parents. Thus, the correlative of parental rights is parental duties. When parents fail to, or are incapable of, performing their parental obligations, the child's welfare must prevail over the right of the parent. Typically, the law affords a very wide latitude to parents in the rearing of children. But there are limits to that latitude. Since children are powerless and have no self-protection, the state must intervene when parents default in their basic parental duties and therefore forfeit their rights.
I readily concede that there appear to be difficulties with the 1981 statute. For example, one of the eight stated criteria is: "[u]nexplained serious injury or death of a sibling of the child." That provision was apparently designed to reach serious child abuse, and to that extent it focuses on a proper consideration. But the language goes too far. Injury or death may be entirely unrelated to parental fault or neglect. Furthermore, as noted, the "reasonable preference of the child" cannot serve as an independent basis for severance of parental ties, although in some cases it may be relevant. Some of the other provisions, when applied, may also raise constitutional issues, but that is no basis for declaring the whole act unconstitutional. In any event, if there be fault with the 1981 Act, the appropriate procedure is to construe it so as to avoid unconstitutionality, if possible, In re Boyer, Utah, 636 P.2d 1085 (1981), and, if not, to declare that particular provision unconstitutional, but not the whole act.
It should also be noted that the 1981 Act contemplates requiring some kind of attempted rehabilitation under subparagraph (vi) before severing parental rights as a way of avoiding the harsh and irrevocable alternative of termination. That is now null and void because of today's ruling.
I think the case should have been remanded to the district court for resolution of the petition under the 1981 Act.
NOTES
[1] "`Termination of parental rights' means the permanent elimination of all parental rights and duties, including residual parental rights and duties, by court order." U.C.A., 1953, § 78-3a-2(14). Section 78-3a-2(10) defines "residual parental rights and duties" as follows:

[T]hose rights and duties remaining with the parent after legal custody or guardianship, or both, have been vested in another person or agency, including, but not limited to, the responsibility for support, the right to consent to adoption, the right to determine the child's religious affiliation, and the right to reasonable visitation unless restricted by the court. If no guardian has been appointed, "residual parental rights and duties" also include the right to consent to marriage, to [consent to] enlistment [in the armed forces], and to consent to major medical, surgical, or psychiatric treatment.
Other rights and responsibilities predicated upon the legal parent-child relationship include the following: (1) child's right to inherit from parents and vice versa, § 75-2-103; (2) heirs' right to sue for the wrongful death of an adult, § 78-11-7; (3) parental right to sue for the wrongful death, § 78-11-6, or (4) seduction of a minor child, § 78-11-5; (5) parental right to notice, if possible, of an abortion to be performed upon a minor child, § 76-7-304; (6) parental right to testamentary appointment of a guardian for an unmarried minor, § 75-5-202; (7) pretermitted child's legally protected inheritance rights, § 75-2-302; (8) eligible children's right to receive veterans' educational benefits from the state, § 71-4-2; and (9) parental responsibilities for the care and maintenance of minor children in the state training school, § 64-8-9.
In contrast, "legal custody" is defined in section 78-3a-2(7) as a relationship embodying the following rights and duties:
the right to physical custody of a child; the right and duty to protect, train and discipline him; the duty to provide him with food, clothing, shelter, education, and ordinary medical care; the right to determine where and with whom he shall live, and the right, in an emergency, to authorize surgery or other extraordinary care.
[2] It is unclear whether subsection (a)(ii) of the 1980 amendment makes loss of custody for six months a prerequisite to termination of parental rights or whether the court should merely take such a circumstance into consideration if it occurred.
[3] (1) The court may decree an involuntary termination of all parental rights with respect to one or both parents if the court finds ...:
(a) That such termination will be in the child's best interest. In determining the child's best interest the court shall consider but is not limited to, the following circumstances:
(i) The willingness of the parent or parents to receive or care for the child; Repeated conduct of the parent toward a child resulting in the serious neglect or abuse of the child;
(ii) Emotional illness, mental illness and mental deficiency of the parent, of such nature and extent as to render the parent unable for a reasonable period in the future to care for the physical, mental and emotional needs of the child;
(iii) Excessive and repeated use of intoxicating liquors or narcotics or dangerous drugs by the parent with little likelihood of change;
(iv) Legal determination of the parent as a habitual felon;
(v) Unexplained serious injury or death of a sibling of the child;
(vi) Whether reasonable efforts by appropriate public or private child caring agencies have been made to rehabilitate the family;
(vii) The reasonable preference of the child, if the court deems the child of sufficient capacity to express a preference;
(ii) (viii) That If the child has been removed from the custody of the parent by temporary order of the court for a period of six consecutive months and the court further finds that:
(A) The conditions which led to the removal still exist;
(B) There is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the parent in the near future; and
(C) The continuation of the parent-child relationship greatly diminishes the child's prospects for early integration into a stable and permanent home... .
[4] The well-established general rule is that statutes not expressly retroactive should only be applied prospectively. U.C.A., 1953, § 68-3-3; Union Pacific R.R. Co. v. Trustees, Inc., 8 Utah 2d 101, 329 P.2d 398 (1958); McCarrey v. Utah State Teachers' Retirement Board, 111 Utah 251, 177 P.2d 725 (1947); In re Ingraham's Estate, 106 Utah 337, 148 P.2d 340 (1944). See also Archer v. Utah State Land Board, 15 Utah 2d 321, 392 P.2d 622 (1964). Exceptions to this general rule have been found where an amendment's effect was "procedural" or "remedial." Foil v. Ballinger, Utah, 601 P.2d 144 (1979) (clarified statutory notice provision and changed "commenced" to "initiated"); Petty v. Clark, 113 Utah 205, 192 P.2d 589 (1948) (added new categories of suits where jury is advisory); Boucofski v. Jacobsen, 36 Utah 165, 104 P. 117 (1909) (empowered courts to make additional findings after entry of judgment). In Foil v. Ballinger, 601 P.2d at 151, we quoted with approval a passage from Okland Construction Co. v. Industrial Commission, Utah, 520 P.2d 208, 210-11 (1974), which stated that a statute or amendment may be retroactively applied where it "deals only with clarification or amplification as to how the law should have been understood prior to its enactment."

The 1981 amendment to § 78-3a-48(1)(a) did not make a merely procedural change or clarify how the 1980 statute should have been understood originally. Although the amendment does not alter the subsection's controlling principle  that parental rights may be involuntarily terminated in the child's best interest  it deletes one of the two criteria for determining the child's best interest, clarifies the other, and adds seven new criteria. The additions are extensive, more than doubling the subsection's length. Changes of this magnitude do not fit within the relatively narrow exception illustrated above.
[5] See generally B. Hafen, "Children's Liberation and the New Egalitarianism: Some Reservations About Abandoning Youth to Their `Rights,'" 1976 B.Y.U.L.Rev. 605, 613-630; O. Ketcham & R. Babcock, "Statutory Standards for the Involuntary Termination of Parental Rights," 29 Rutgers L.Rev. 530 (1976).
[6] The Court also declared the statute an unconstitutional denial of equal protection under the Fourteenth Amendment. Since "all Illinois parents are constitutionally entitled to a hearing on their fitness before their children are removed from their custody," 405 U.S. at 658, 92 S.Ct. at 1216, "denying such a hearing to Stanley and those like him while granting it to other Illinois parents is inescapably contrary to the Equal Protection Clause." Id.
[7] The quoted language appears in Smith v. Organization of Foster Families, 431 U.S. 816, 862-63, 97 S.Ct. 2094, 2119, 53 L.Ed.2d 14 (1977) (Stewart, J., concurring in judgment).
[8] In Quilloin, a unanimous Court held that a showing that adoption by the stepfather would be in the child's best interest was sufficient to terminate the parental rights of an unwed father who had "never exercised actual or legal custody over his child, and thus [had] never shouldered any significant responsibility with respect to the daily supervision, education, protection, or care of the child," 434 U.S. at 256, 98 S.Ct. at 555, especially where the proposed adoption would not "place the child with a new set of parents with whom the child had never before lived" but rather "give full recognition to a family unit already in existence, a result desired by all concerned, except [the natural father]." Id. at 255, 98 S.Ct. at 555.
[9] We perceive no equal protection problem in this well-established distinction. The U.S. Supreme Court has stated that "nothing in the Equal Protection Clause" prevents differentiating between mothers and unmarried fathers "[i]n those cases where the father never has come forward to participate in the rearing" of an older child. Caban v. Mohammed, 441 U.S. 380, 392, 99 S.Ct. 1760, 1768, 60 L.Ed.2d 297 (1979). The Court expressed no opinion on the case of the unwed father of a newborn infant. Id. at n. 11.
[10] In addition, in Santosky v. Kramer, ___ U.S. ___, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the Supreme Court held that the constitutionally protected relationship between parent and child is so "commanding" that it cannot be severed involuntarily merely upon proof by a "fair preponderance of the evidence" that a child was permanently neglected. To "satisfy due process," the Court held, the level of proof required to terminate the parents' "fundamental liberty interest" in their relationship with their child must be at least "clear and convincing evidence." Id. at 1396-97 and 1402-03. Accord State in re Pitts, Utah, 535 P.2d 1244, 1248 (1975).
[11] Though extreme, there is a basic truth undergirding the observation of one scholar that judging each parent against all other adults in an official determination of his or her child's best interest "could lead to a redistribution of the entire minor population among the worthier members of the community... ." H. Simpson, "The Unfit Parent: Conditions Under Which a Child May be Adopted Without the Consent of His Parent," 39 U. Detroit L.J. 347, 355 (1962).
[12] The quotation at the conclusion of this passage is from Justice Goldberg's concurring opinion in Griswold v. Connecticut, 381 U.S. 479, 493, 85 S.Ct. 1678, 1686, 14 L.Ed.2d 510 (1965).
[13] On the other hand, "while there is still reason to believe that positive, nurturing parent-child relationships exist, the parens patriae interest favors preservation, not severance, of natural familial bonds." Santosky v. Kramer, ___ U.S. ___, 102 S.Ct. 1388, 1401, 71 L.Ed.2d 599 (1982).
[14] The effect of this holding on pending and future petitions to terminate parental rights deserves clarification.

Where amendatory legislation repealing or displacing a former statute addressing the same subject matter is held unconstitutional, the amendment has no superseding effect and the prior statute remains in full force as though no amending legislation had been enacted. State ex rel. Shields v. Barker, 50 Utah 189, 167 P. 262 (1917); Board of Education v. Hunter, 48 Utah 373, 159 P. 1019 (1916); Van Driel Drug Store, Inc. v. Mahin, 47 Ill.2d 378, 265 N.E.2d 659 (1970); State in re Hunter, La., 387 So.2d 1086 (1980); State ex rel. Burns v. Steely, Okl. Cr., 600 P.2d 367 (1979). While a different result might follow where the Legislature clearly intended the prior statute to be repealed even if the substituted statute were invalidated, American Independent Party in Idaho, Inc. v. Cenarrusa, 92 Idaho 356, 442 P.2d 766 (1968), we have no basis to attribute such an intent to the Legislature in this case.
The 1981 amendment does not remain in effect after this invalidation of the best interest standard enacted in the 1980 amendment. The 1981 amendment only added new criteria for determining the child's best interest; it did not enact or reenact the best interest standard itself, since that standard was already in force before that amendment was passed. U.C.A., 1953, § 68-3-6. When the trunk is uprooted, the branch engrafted upon it must also fall.
For the reasons stated above, U.C.A., 1953, § 78-3a-48(1)(a), as enacted in 1965, is not repealed but remains in force to the same extent as if the portions of the 1980 and 1981 amendments invalidated in this opinion had never been enacted.