Gordon Allyn **COPPEDGE** and Anna Gloria Coppedge, Petitioners,

v.

The Honorable Raymond M. **HARDING**, Fourth Judicial District Judge, and James Henry Hyde and Gail Ann Coppedge Hyde, Respondents.

No. 20862.

Supreme Court of Utah.

Nov. 21, 1985.

Suzanne Marelius, Salt Lake City, for petitioners.

David L. Wilkinson, Atty. Gen., Salt Lake City, Lynn D. Wardle, Provo, Jay W. Fitt, Orem, for respondents.

## ORDER

PER CURIAM.

On March 19, 1985, Gordon and Anna Coppedge, petitioners in this action, requested that the circuit court of Washington County, Oregon, make them guardians of Jason Allyn Hyde, their ten-year-old grandson who was residing with them in Oregon. *In re Jason Allyn Hyde*, No. J 13–259 (Circuit Court of Washington County, Oregon). The Oregon court granted the guardianship petition on July 1, 1985, and appointed the Coppedges as Jason's guardians until his twenty-first birthday, subject to review in one year from the date of the order.

Jason's parents, James and Gail Hyde, respondents herein, are residents of Utah. On advice of counsel, who informed them that the Oregon court had no jurisdiction, the Hydes did not appear in the Oregon action, although they were notified of the pendency of the guardianship petition. On May 9, 1985, while the guardianship petition was pending, the Hydes instituted an

action against the Coppedges in the district court in Utah County, Utah. *Hyde v. Coppedge*, No. 69556 (Fourth Judicial District Court of Utah County, Utah, filed May 9, 1985). In that action, the Hydes are seeking to obtain custody of Jason. The Hydes also assert numerous tort claims against the Coppedges and seek compensatory and punitive damages.

The Coppedges moved to dismiss the Utah action on June 11, 1985. Before the Utah court had ruled on the Coppedges' motion, the Hydes moved on August 13, 1985, for a temporary restraining order directing the Coppedges to return custody of Jason to the Hydes. The Utah court granted the temporary restraining order on August 13, 1985, and on August 23rd denied the Coppedges' motion to dismiss. On August 29, 1985, the Coppedges filed a petition with this Court for a writ of mandamus, asking that we direct the district court to dismiss the action filed by the Hydes, dissolve the temporary restraining order, and order the return of Jason to Oregon.

 We have heard argument and have considered the extensive filings of the parties and conclude as follows: that the Oregon court had jurisdiction over Jason Hyde under section 3 of the Uniform Child Custody Jurisdiction Act, which has been enacted in Oregon as Or.Rev.Stat. §§ 109.-700 to .930 (1983); that respondents James and Gail Ann Hyde were properly served with notice of the Oregon proceeding under section 5 of the Uniform Act and were provided an opportunity to be heard by the Oregon court, an opportunity they declined to exercise; that the Oregon court's assumption of jurisdiction to enter an order instituting a guardianship over Jason Hyde did not violate the due process clause of the fourteenth amendment to the United States Constitution; that under section 6 of the Uniform Act, enacted in Utah as section 78–45c–6 of the Code, the Utah district court was required to stay the Utah proceeding to the extent that the Hydes sought an order determining the custody of Jason under the provisions of the Uniform

Act and to communicate with the Oregon court as soon as it was apprised of the prior Oregon proceeding "to the end that the issues may be litigated in the more appropriate forum"; that the Utah court did not take these statutorily required steps; that on the basis of the facts made known to it, the Oregon court exercised jurisdiction over Jason Hyde "substantially in conformity" with the Uniform Act and, therefore, under section 78–45c–6(1), the Utah court should not have exercised jurisdiction over the matter unless the Oregon court, after having been contacted by the Utah court, had first stayed its proceeding in favor of Utah, as contemplated by section 6(1), or until the Oregon court had an opportunity to consider and determine the claims of respondents Hyde that Oregon should not exercise jurisdiction under the Uniform Act for any reason; that if the Oregon court continues in its exercise of jurisdiction over Jason Hyde after being presented with respondents Hyde's contentions, there will be ample opportunity for the Utah court to look further into the question of whether, on the facts made known to it, the Oregon court has exercised jurisdiction "substantially in conformity with" the Uniform Act, as contemplated by sections 78–45c–6(1) and 78–45c–8 of the Code, and whether the Oregon court's order is subject to modification under section 78–45c–14.

Based on the foregoing, the district court is ordered to stay the Utah action to the extent that it seeks to determine custody under the Uniform Act. The district court is further ordered to communicate with the Oregon court, as required by section 78–45c–6(3) of the Code, to determine the propriety of further proceedings in Oregon. In the event that the Oregon court stays its proceedings after such communication, then the Utah court may proceed to adjudicate the custody matter.

The need for prompt action in this matter requires the immediate issuance of this order. Opinions will follow.

STEWART, Justice (dissenting):

This case presents the question of whether married natural parents who have never been declared unfit parents, who have not abandoned their child, and who sent their child out of state voluntarily and temporarily to live with its grandparents for a school year can either be deprived of the custody of their child by a court of the other state or forced to litigate their custody rights in that other state's court.

This matter is before this Court on a petition for a writ of mandamus. The petition requests this Court to order the Fourth District Court of Utah County to dismiss an action in which the natural parents living in Utah seek to reestablish their custodial rights over their son, Jason Allyn Hyde, a minor. Jason was visiting with his grandparents in Oregon with his parents' consent. During his visit, the grandparents filed a petition in an Oregon court for appointment as Jason's guardians. The parents did not answer or appear in the Oregon action. The Oregon court in a default judgment awarded the grandparents custody of Jason and appointed them his guardians until he reached 21 years or the court ordered otherwise. It thereby, for practical purposes, terminated the parental rights of Jason's parents on what I believe is a usurpation of power and a total absence of a factual foundation that the parents are unfit or have neglected or abandoned their child. *See In re J.P.*, Utah, 648 P.2d 1364 (1982).

The majority in effect holds that an Oregon court can terminate the parental rights of Jason's natural parents and grant custodial rights to the boy's grandparents. I dissent from this Court's order because (1) under properly applied constitutional standards, the Oregon court has no jurisdiction, and (2) the Oregon court had no statutory jurisdiction under the Uniform Child Custody Jurisdiction Act (UCCJA).

## I.

In August, 1983, Jason Hyde, age nine, by mutual arrangement between his grandparents, the Coppedges, and his parents, the Hydes, went to Oregon to live with the grandparents during the 1983–84 school year. To facilitate this arrangement, his parents executed a revocable power of attorney to enable the grandparents to fully care for Jason while he was staying with them.

At the end of the school year, Jason returned to Utah for the summer. Under arrangements similar to the previous year, he returned to Oregon in August, 1984. In September, 1984, the parents learned that the grandparents did not intend to return Jason to Utah at the end of the 1984–85 school year. They demanded that the grandparents return Jason to Utah immediately. The grandparents refused, but eventually they reaffirmed their agreement to return Jason to his parents at the end of the school year, so the parents agreed to allow Jason to remain in Oregon until then.

In early March, 1985, the grandparents informed the parents that Jason would not be returned at the end of the school year. The parents again demanded Jason's return, and the grandparents again refused. On March 19, 1985, the grandparents filed a petition for appointment as Jason's guardians in the Juvenile Department of the Oregon Circuit Court for Washington County. In response to the grandparents' consistent refusal to agree to relinquish Jason at the end of the school year, his parents, on May 9, 1985, commenced an action in Utah's Fourth District Court seeking to compel the grandparents to return Jason.[1] Meanwhile, the hearing on the grandparents' Oregon petition was set for

---

1. In the interim, the parents had been doing everything within their power to persuade the grandparents to return their son. They had spoken with the grandparents directly many times, and with other relatives. They had talked to their bishop. They had also contacted the grandparents' bishop and a member of the grandparents' stake presidency. All of the persons they contacted agreed that Jason should be returned to his family, and the parents believed that the grandparents would eventually heed that advice. The grandparents once before had threatened not to return Jason, but had relented.

hearing on June 19, 1985. The parents were notified of the hearing, but on advice of counsel that the Oregon court did not have jurisdiction, they did not answer or appear. The Oregon court, without giving notice to the Utah court, thereupon entered an order stating that "Gordon Allyn Coppedge and Anna Gloria Coppedge, the maternal grandparents, are awarded the care, custody and control of Jason Allyn Hyde;" and appointed the grandparents "general guardians of the person of Jason Allyn Hyde, the above-named minor child, until further order of the Court or until said minor child attains the age of twenty-one years, whichever first occurs,...." The order also provided for a status report on Jason in approximately one year.

When the grandparents continued to refuse to allow Jason to return to his family, his parents, in August, 1985, obtained a ten-day temporary restraining order in a Utah court directing the grandparents to return Jason to Utah. The Utah district court conducted a hearing on a motion brought by the grandparents to dismiss the parents' action under the Utah version of the UCCJA, U.C.A., 1953, section 78–45c–1, *et seq.* (Supp.1985). Judge Harding ruled that the Oregon court did not have jurisdiction under the UCCJA, and therefore denied the grandparents' motion to dismiss under U.C.A., 1953, section 78–45c–6 (Supp. 1985).

Finally, because the Oregon court had lacked jurisdiction in the Oregon proceeding, Judge Harding concluded that the Oregon court's custody order was invalid. Therefore, there was no need for a temporary restraining order (TRO) or an injunction to keep Jason in Utah. Accordingly, in a minute entry dated August 28, 1985, the Utah court denied the parents' motion to continue the TRO and confirmed their right to the custody of Jason by stating that it would not violate any order of the Utah court for his parents to keep Jason in Utah.

## II.

I submit that the Court's order is founded on moot issues. First, the Court's writ of mandamus purports to compel the Utah district court not to address the right of custody of Jason Hyde even though the trial court has already ruled that it need not and will not proceed further with that issue. The order states, "[T]he district court is ordered to stay the Utah action to the extent that it seeks to determine custody under the Uniform Act." But the district court has already determined that it would not issue a custody decree because the Oregon court acted without jurisdiction and custody remains in the parents by natural right. This Court's order is moot because it directs the district court to refrain from doing that which it has already ruled it will not, and need not, do. *See In re J.P., supra.*

Second, the writ also directs the trial court to perform a useless and meaningless act, i.e., to contact the Oregon trial court. Specifically, the trial court is ordered

> to communicate with the Oregon court, as required by section 78–45c–6(3) of the Code, to determine the propriety of further proceedings in Oregon. In the event that the Oregon court stays its proceedings after such communication, then the Utah court may proceed to adjudicate the custody matter.

The problem with that order is that the Oregon court has already issued a final order and its proceedings are complete. While it is true that the court retains jurisdiction to modify the custody order, a communication to that court will be only a futile and meaningless gesture. That court surely knew that the natural parents lived in Utah and had lived here with Jason for a number of years. When that court purported to cut off the Coppedges' constitutionally protected parental rights in the face of Oregon's tenuous relationship with Jason and its complete lack of "minimum contacts" with his parents, it must have done so on the basis of known facts that the majority of this Court now directs the Utah district court to bring to the attention of the Oregon court. A writ of mandamus ought not to issue to compel a futile gesture.

Furthermore, the Court's order does not even purport to correct an abuse of discretion—the foundational requirement for the issuance of a writ of mandamus.

## III.

The grandparents initiated the Oregon proceeding and attempted to have the Utah action dismissed under the auspices of the UCCJA, which has been adopted by both states. Whatever the Act's statutory grant of jurisdiction, that jurisdiction must comport with constitutional notions of due process.

In *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), the United States Supreme Court held that with certain exceptions, jurisdiction for all state court proceedings would be governed by the minimum contacts-due process standards set forth in *International Shoe Co. v. Washington*, 326 U.S. 310, 317, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny. *Shaffer, supra*, 433 U.S. at 212, 97 S.Ct. at 2583. One exception was set forth in footnote 30. The *Shaffer* Court stated: "We do not suggest that jurisdictional doctrines other than those discussed in text, such as the particularized rules governing adjudications of status, are inconsistent with the standard of fairness." *Id.* at 208 n. 30, 97 S.Ct. at 2582, n. 30.

Child custody determinations have generally been acknowledged to be "adjudications of status." *See, e.g., Restatement (Second) of Conflict of Laws* § 79 (1971); Goodrich, *Custody of Children in Divorce Suits*, 7 Cornell L.Q. 1, 2–3 (1921). Simply stated, footnote 30 holds that although in status determinations jurisdiction may be determined by the "particularized rules" applicable thereto rather than by minimum contacts standards, those particularized rules must comport with traditional notions of fundamental fairness. The specialized jurisdictional rules of the UCCJA as applied by the Oregon court in this case do not comport with traditional notions of fundamental fairness.

Child custody disputes portend serious modifications not only of the protected child's interests, but also of at least one parent's constitutionally protected parental right.

There is a genuine and long-standing national consensus that legal rules applicable in custody cases should serve the interests of the children more than the interests of the parents. [We take] no exception to that principle. This lack of emphasis on the defendant's contacts with the forum state may nevertheless violate due process. The rules of jurisdiction governing child custody cases are "particularized," but their compliance with due process depends upon whether the special nature of the status that is involved justifies the rules' lack of defendant contacts requirements. The momentous consequences of a custody determination for both the child and the parents seem to indicate that the basis of a state's jurisdiction should ordinarily include significant forum-defendant contacts.

Coombs, *Interstate Child Custody: Jurisdiction, Recognition, and Enforcement*, 66 Minn.L.Rev. 711, 749 (1982).

I take no exception to the principle of emphasizing the best interests of the child in custody proceedings when the custody battle is between the child's divorced parents. This situation, however, is not a divorce custody proceeding. In a divorce custody proceeding, it is implicit that there will be a modification of the child's relationship with at least one parent. In this case, however, the parents together assert their rights as parents; there is no dispute between them. No court has found them unfit, nor has the allegation even been made.

This dispute arose at the instigation of the grandparents, in opposition to Jason's natural parents, the Hydes, who were at all times relevant to this dispute married and living with their other children as a nuclear family unit. Jason's parents have indicated no intent to modify their relationship with Jason and had absolutely no basis for anticipating any deprivation of their parental rights by allowing Jason to reside with the

grandparents for a while. Even if the grandparents are well-meaning and have been helpful to Jason, the plain fact is that the grandparents are interlopers and have no colorable claim to take Jason from the custody of his natural parents.

Jason's parents have a constitutionally protected right to raise him. *E.g., Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982) (there is a "fundamental liberty interest of natural parents in the care, custody, and management of their child...."); *Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978) (U.S. Supreme Court has "recognized on numerous occasions that the relationship between parent and child is constitutionally protected."); *In re J.P.,* Utah, 648 P.2d 1364, 1372 (1982) (parents have constitutional right to raise own children); *In re Castillo,* Utah, 632 P.2d 855, 856 (1981) (parents have prior and fundamental right to rear their own children). If the Oregon court's order stands, it amounts to a direct infringement of Jason's parents' constitutionally protected right to raise him. The Oregon court's order transfers custody to the grandparents until Jason is 21 years of age or until the Oregon court in its discretion decides to change the order. A more direct and fundamental violation of the parents' constitutional rights is hardly imaginable. If the state of Oregon can do this to Jason's parents, no family unit is immune from the overwhelming power of the state to remove any child from any family on the ground that some other person can do a better job of parenting and provide a more nurturing environment for the child. If such a principle were once to be established, the fundamental relationship of parents to their children would forever be changed.

Since Jason's relationship with his parents is the subject of this dispute, and since Jason's parents are not even alleged to have been unfit or to have neglected or abandoned Jason, and since their domicile is here and they want custody of their son, I submit that only Utah has jurisdiction to deprive the parents of their custodial rights. *See Shaffer, supra,* 433 U.S. at 207–08, 97 S.Ct. at 2581.

On the basis of the evidence adduced in the *ex parte* hearing held in Oregon, one might conclude that Jason is better off in Oregon with his grandparents. Indeed, it appears that Jason was seriously upset by the custody battle that has erupted. However that may be, I believe that the parents have the right to be protected from having to fight a legal battle in Oregon to protect their parental rights to custody.

## IV.

Utah state courts are not constitutionally required to give the child custody decisions of sister states full faith and credit. On the contrary, the United States Supreme Court has held that the states have *carte blanche* "to disregard the [custody] judgment [of another state], to qualify it, or to depart from it as does the State where it was rendered." *New York ex rel. Halvey v. Halvey,* 330 U.S. 610, 615, 67 S.Ct. 903, 906, 91 L.Ed. 1133 (1947). In order to remedy this lack of full faith and credit, among other reasons, Utah and other states have enacted the UCCJA. *See, e.g.,* U.C.A., 1953, § 78–45c–1, *et seq.* (Supp. 1985).

The Utah trial court has constitutional jurisdiction because the natural parents and the child are both in Utah, and it has statutory jurisdiction under the UCCJA to decide the custody of the child in this case under U.C.A., 1953, section 78–45c–3(1)(b) (Supp.1985). Under that section, a Utah court has jurisdiction to make a custody determination if

It is in the best interests of the child that a court of this state assume jurisdiction because (i) the child and his parents, or the child and at least one contestant, have a significant connection with this state, and (ii) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships[.]

*Id.* For nearly seven years, Utah has been the domicile of Jason's family. Jason's nuclear family, his permanent contacts, his

educational and medical records, his cub scout troup, and other associations and ties are in Utah.

The practical objective of the grandparents' Oregon proceeding was to terminate the parental rights of Jason's parents. American courts do not deprive parents of child custody unless there is abuse, neglect, or parental unfitness. *In re J.P.*, Utah, 648 P.2d 1364 (1982). When the issue of custody is raised by a third person, the standard of protection is especially high. *See id.* at 1377. Virtually all evidence of the parents' fitness, the history of their relationship with Jason, and their parenting abilities is in Utah. The parents have not been to Oregon for more than four years, and then were only there for a short vacation. Thus, the Utah court has jurisdiction under U.C.A., 1953, section 78–45c–3(1)(b).

Further, the Utah trial court had jurisdiction even though the grandparents' custody proceeding was pending before an Oregon court. U.C.A., 1953, section 78–45c–6(1) (Supp.1985) commands that

(1) A court of this state shall not exercise its jurisdiction under this act [the Utah UCCJA] if at the time of filing the petition a proceeding concerning the custody of the child was pending in a court of another state *exercising jurisdiction substantially in conformity with this act....*

(Emphasis added.) The Oregon court asserted jurisdiction over the grandparents' Oregon petition for custody under the Oregon version of the UCCJA. Or.Rev.Stat. § 109.700 to .930 (1983). *In re Jason Allyn Hyde*, No. J 13–259 (Cir. Court of Washington County, Oregon, July 1, 1985). However, as demonstrated below, the Oregon court did not have statutory jurisdiction under the UCCJA. Therefore, the Oregon court did not "exercis[e] jurisdiction substantially in conformity with this act...." Thus, the Utah court was justified under U.C.A., 1953, section 78–45c–6(1)

in exercising jurisdiction over the action brought by Jason's parents in Utah. The holding of the majority that Oregon had jurisdiction is faulty because this Court has not inquired whether Oregon asserted jurisdiction "substantially in accordance with this act." U.C.A., 1953, § 78–45c–6(1) (Supp.1985).

Neither party has referred this Court to a case in which a court has exercised jurisdiction under the UCCJA to deprive living married parents residing out of state of the custody of a child whom they sent to reside temporarily in the forum state. That the Oregon court acted without statutory jurisdiction is established by an analysis of section 3 of the Act. *See* U.C.A., 1953, § 78–45c–3 (Supp.1985).[2] The first basis for the exercise of jurisdiction under that section is contained in U.C.A., 1953, section 78–45c–3(1)(a) (Supp.1985),[3] which states:

(1) A court of this state which is competent to decide child custody matters has jurisdiction to make a child custody determination by initial or modification decree if:

(a) *This state (i) is the home state of the child at the time of commencement of the proceeding,* or (ii) had been the child's home state within six months before commencement of the proceeding and the child is absent from this state because of his removal or retention by a person claiming his custody or for other reasons, and a parent or person acting as parent continues to live in this state[.]

(Emphasis added.) The term "home state" is statutorily defined by the UCCJA. U.C.A., 1953, section 78–45c–2(5) (Supp. 1985)[4] defines "home state" as

the state in which the child, immediately preceding the time involved, lived with his parents, a parent, or *a person acting as parent,* for at least six consecutive months....

---

2. The provision is substantively identical to Or. Rev.Stat. § 109.730 (1983).

3. The provision is substantively identical to Or. Rev.Stat. § 109.730(1)(a) (1983).

4. The provision is substantively identical to Or. Rev.Stat. § 109.710(5) (1983).

(Emphasis added.) In order to qualify as a "person acting as parent," the person must meet the UCCJA definition of that term. U.C.A., 1953, section 78–45c–2(9) (Supp. 1985)[5] states that

> "Person acting as parent" means a person, other than a parent, who has physical custody of a child and *who either has been awarded custody by a court or claims a right to custody.*

(Emphasis added.) At the time the grandparents first went into court in Oregon, they satisfied neither of these definitions. By agreement, the parties had temporarily placed Jason in the grandparents' home. The grandparents had not been awarded custody of the child by a court, and before going into court in Oregon, they had no claim of legal right to custody. Indeed, they had promised to return Jason to his parents and had reneged on that promise.

To qualify as a "person acting as parent," it is not enough merely to assert that the person would be a suitable guardian and would like to be awarded custody of the child. A person must have a claim of legal right to custody of the child. In this case, the only people with claims of legal right to Jason's custody prior to the Oregon proceeding were Jason's parents.

There are situations in which no one has a prior claim of legal right to custody, and a court could justifiably assert jurisdiction for the protection of the child. For example, if both parents are killed in a car accident and the child survives, the forum state has a responsibility to provide for the child's welfare and safety, and as *parens patriae* could have at least a temporary claim of legal right to custody. However, "[i]t is fundamental to our jurisprudence that 'the custody, care and nurture of the child reside first in the parents[.]'" *In re J.P.*, Utah, 648 P.2d 1364, 1372 (1982) (*quoting Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944)). In this case, where the parents

are alive, married, and have not relinquished custody or otherwise abandoned the child, it cannot be said that the grandparents could legitimately claim a "right" to custody in the Oregon court. *See In re Marriage of Schwander*, 79 Cal.App.3d 1013, 145 Cal.Rptr. 325 (1978). *Bell v. Bell*, Mo.App., 682 S.W.2d 892 (1984). *Compare In re B.R.F.*, Mo.App., 669 S.W.2d 240 (1984) (when divorced mother who had been awarded custody of children died, grandmother who cared for children pending custody proceeding was a "person acting as parent"). Since, the grandparents did not satisfy the statutory definition of "person acting as parent," Oregon is not Jason's "home state" as that term is defined by statute. Therefore, the Oregon court could not exercise jurisdiction under U.C.A., 1953, section 78–45c–3(1)(a).

For substantially the same reasons, the Oregon court could not exercise jurisdiction under U.C.A., 1953, section 78–45c–3(1)(b) (Supp.1985),[6] which allows a court to take jurisdiction in a child custody proceeding if

> (b) It is in the best interest of the child that a court of this state assume jurisdiction because (i) the child and his parents, or the child and *at least one contestant*, have a significant connection with this state, and (ii) there is available in this state substantial evidence concerning the child's present or future care, protection, training, and personal relationships[.]

(Emphasis added.) The UCCJA contains a statutory definition of "contestant." U.C.A., 1953, section 78–45c–2(1) (Supp. 1985)[7] states:

> (1) "Contestant" means a person, including a parent, who claims a right to custody or visitation rights with respect to a child.

As stated above, the grandparents had "no claim of right" to custody. Neither did they have any "visitation rights with respect to the child" under the terms of the

---

5. The provision is substantively identical to Or. Rev.Stat. § 109.710(9) (1983).

6. The provision is substantively identical to Or. Rev.Stat. § 109.730(1)(b) (1983).

7. The provision is substantively identical to Or. Rev.Stat. § 109.710(1) (1983).

above provision. The child was visiting the grandparents, but a visit, even an extended visit, did not confer on the grandparents "visitation rights with respect to a child." The statute is designed to protect a person whose judicially decreed visitation rights are being denied.

Nor could the court have taken jurisdiction under the emergency jurisdiction provision of the UCCJA, U.C.A., 1953, section 78–45c–3(1)(c) (Supp.1985),[8] which would have allowed the Oregon court to take jurisdiction if

> (c) The child is physically present in this state and (i) the child has been abandoned or (ii) it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent[.]

The UCCJA Commissioners intended this provision to have a very limited scope. "[T]his extraordinary jurisdiction is reserved for extraordinary circumstances.... When there is child neglect without emergency or abandonment, jurisdiction cannot be based on this paragraph." UCCJA § 3(a)(3), Commissioners Note. *See* Bodenheimer, *Progress Under the Uniform Child Custody Jurisdiction Act and Remaining Problems: Punitive Decrees, Joint Custody, and Excessive Modification*, 65 Cal.L.Rev. 978, 992–95 (1977).

There was neither neglect nor emergency that justified the court's exercise of jurisdiction. Indeed, there is not even an allegation that Jason was abandoned or neglected. His parents had voluntarily, but temporarily, placed Jason in his grandparents' care for the purpose of assisting Jason and alleviating a difficult family situation.

Additionally, "[i]f the alleged danger [which justifies emergency jurisdiction] exists in another state [i.e., Utah], the evidence must, under the Act, be exceedingly strong to warrant an interference with the jurisdiction of another state [i.e., Utah]." Bodenheimer, 65 Cal.L.Rev. at 994. What evidence there was did not justify the Oregon court's reliance on emergency jurisdiction. *See In re Marriage of Schwander*, 79 Cal.App.3d 1013, 145 Cal.Rptr. 325 (1978). Rather, that evidence should have been communicated to the forum where jurisdiction was appropriate, Utah. Bodenheimer, 65 Cal.L.Rev. at 994–95. While "there will be attempts to circumvent the Act by 'shouting fire' in every conceivable situation[,]" *id.* at 992, emergency jurisdiction exists under the statute only in very few cases, and this case is not one.

Finally, the Oregon court could not take jurisdiction under U.C.A., 1953, section 78–45c–3(1)(d) (Supp.1985),[9] which allows a court to take jurisdiction if

> (d)(i) It appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraph (a), (b) or (c) of this subsection, or another state has declined to exercise jurisdiction on the ground that this state is the more appropriate forum to determine the custody of the child, (ii) and it is in the best interest of the child that this court assume jurisdiction.

The determination that Oregon did not have jurisdiction to grant the grandparents custody is bolstered by U.C.A., 1953, section 78–45c–3(2) (Supp.1985).[10] That section states that the mere presence of the child, or even the presence of the child and one contestant, is not enough to justify a court's exercise of jurisdiction under the UCCJA unless the facts warrant an exercise of emergency jurisdiction under section 3(c) or no other state would have jurisdiction under section 3(d).

Even if jurisdiction in Oregon were proper under one of the above provisions of UCCJA section 3, the Oregon court still should have refused to exercise jurisdiction under the UCCJA's "child snatching" provi-

---

**8.** The provision is substantively identical to Or. Rev.Stat. § 109.730(1)(c) (1983).

**9.** The provision is substantively identical to Or. Rev.Stat. § 109.730(1)(d) (1983).

**10.** The provision is substantively identical to Or.Rev.Stat. § 109.730(2) (1983).

sion. Although "child snatching" is a loaded term, and I do not mean to impugn the motives of the grandparents, the fact remains that Jason was sent to Oregon temporarily in reliance on the grandparents' promise to return Jason and that the grandparents, when asked on numerous occasions to return Jason, improperly retained him against his parents' wishes and in breach of the agreement between the parents and the grandparents.

There are two types of "child snatching" under UCCJA section 8, wrongful removal of the child and wrongful retention of the child after a temporary visit. *See* U.C.A., 1953, § 78–45c–8 (Supp.1985). Professor Bodenheimer, the Reporter for the Commissioners who drafted the UCCJA, has stressed that the act was intended to give new confidence to custodial parents who send their children on out-of-state visits so that they are not forced to go to the state of visitation to litigate the custody of their own children wrongfully detained. Bodenheimer, 65 Cal.L.Rev. at 987.

When a child is wrongfully retained in a foreign jurisdiction, U.C.A., 1953, section 78–45c–8(2) (Supp.1985)[11] provides:

(2) Unless required in the interest of the child, the court shall not exercise its jurisdiction to modify a custody decree of another state if the petitioner, without the consent of the person entitled to custody, ... has improperly retained the child after a visit or other temporary relinquishment of physical custody.

*See Angell v. Sixth Judicial District Court,* Utah, 656 P.2d 405 (1982). This case is directly analogous to the child snatching which this provision was designed to deal with. It differs only because the parents' rights do not emanate from a court decree but from their status as parents. Because of this, the Oregon court should have refused to exercise jurisdiction under the "unclean hands" provision of the UCCJA. *See* U.C.A., 1953, § 78–45c–8(1) (Supp.1985).[12]

In sum, Utah courts, under section 78–45c–6, are required to refrain from exercising jurisdiction under the Act "if at the time of filing the petition a proceeding concerning the custody of the child was pending in a court of another state exercising jurisdiction," but only if that court acts "substantially in conformity with this act, ...." Oregon has not exercised jurisdiction substantially in conformity with this Act. On the contrary, the Oregon court has unwittingly given force and effect to the petitioners' misrepresentations, and has acted in excess of its jurisdiction and in a manner that is plainly at odds with the beneficial objectives of the UCCJA.

The majority directs the trial court to engage in the seemingly innocuous act of communicating with the state of Oregon pursuant to the provisions of section 78–45c–6, even though there is no showing that counsel sought that relief in the trial court. Supposedly, the purpose of that communication is to assure that the issue of custody "may be litigated in the more appropriate forum...." § 78–45a–6(3). But communication is required only if (1) Oregon had exercised jurisdiction "substantially in conformity with this act," § 78–45c–6(1), and only if (2) a custody proceeding were "pending" in that state. § 78–45c–6(3). Neither of those prerequisites is met here. Not only did Oregon not have jurisdiction, but whatever semblance of jurisdiction it did have was violated by the "child snatching" of the petitioners. Nor is there a custody proceeding "pending" in Oregon. The Oregon proceeding is finished. There is nothing left for that court to do. That the custody decree may be modified does not change the fact. It is folly, in my view, to suppose that the Oregon court will simply declare its own decree to be of no effect at this point. And to require the respondents, who have been in financial distress because of the unemployment of the father, and who are represented by *pro bono* counsel, to go to Oregon to move for a modification of the de-

---

**11.** The provision is substantively identical to Or.Rev.Stat. § 109.780(2) (1983).

**12.** The provision is substantively identical to Or.Rev.Stat. § 109.780(1).

cree is the very kind of thing the UCCJA was designed to prevent. In my view, the trial court acted correctly.

## V.

Finally, the grandparents are here on a petition for a writ of mandamus. The Court should grant the grandparents' writ only if the trial court abused its discretion. *Angell v. Sixth Judicial District Ct.*, Utah, 656 P.2d 405, 407 (1982). *See Ketchum Coal Co. v. District Ct.*, 48 Utah 342, 349, 159 P. 737 (1916). Mandamus is not available as a substitute for an appeal. *Commercial Security Bank v. Phillips*, Utah, 655 P.2d 678, 679 (1982). Generally, mandamus is inappropriate to remedy an erroneous assumption of jurisdiction by a lower court if the error is reviewable by the regular methods provided by statute. 52 Am.Jur.2d *Mandamus* § 312 (1970). Although this Court has been rather liberal in allowing mandamus to be used in child custody matters, it should not be used unless there is a clear abuse of discretion. No such case has been made here; indeed, I submit the trial court was entirely correct in what it did.

HOWE, J., concurs in the dissenting opinion of STEWART, J.