**Lauralee CURTIS, Plaintiff and Appellant,**

v.

**William Gregory CURTIS, Defendant and Respondent.**

**No. 890210–CA.**

Court of Appeals of Utah.

March 27, 1990.

Susan White Griffith, Provo, for plaintiff and appellant.

Marlin J. Grant, Logan, for defendant and respondent.

Before DAVIDSON, BILLINGS and ORME, JJ.

## OPINION

ORME, Judge:

Appellant Lauralee Curtis appeals from an order of the Fourth District Court dismissing her order to show cause and enforcing an order from a Mississippi court modifying a custody arrangement previously decreed in a Utah divorce action. We conclude that the decision of the Utah court is not consistent with the Parental Kidnapping Prevention Act of 1980, 28 U.S.C. § 1738A (1989). We accordingly reverse.

### FACTS

The parties to this dispute were granted a decree of divorce on December 4, 1987, by Utah's Fourth District Court. At the time of divorce, the parties had seven minor children. The divorce decree granted appellant, Lauralee Curtis, the children's mother, custody of the four youngest children. The older three children were allowed to choose with which parent they wanted to live. They chose their father, respondent William Gregory Curtis.

In February 1988, Lauralee consented to William's taking the children for visitation over the Presidents' Day weekend. Without Lauralee's knowledge, he took the children to Mississippi, where he claimed he first learned that the children had been allegedly abused while in Lauralee's custody. Instead of returning the children following Presidents' Day, William retained custody of the younger children in Mississippi, in violation of the Utah divorce decree.

On February 16, William filed a complaint with a Mississippi court requesting: (1) a protective order against Lauralee pursuant to the Mississippi Protection From Domestic Abuse Law, Miss.Code Ann. §§ 93–21–1 to –29 (1989) and (2) modification of the Utah divorce decree to grant him custody of the younger children. The Mississippi court, in an *ex parte* order, granted temporary custody to William. Lauralee Curtis did not know what had become of the children until she received notice of the *ex parte* order and of the petition to modify the custody decree.

Lauralee obtained counsel in Mississippi and, on February 26, a motion to dismiss for lack of jurisdiction was filed on her behalf. The Mississippi court held a three-day hearing on William's complaint and Lauralee's motion to dismiss. Both parties appeared and were represented by counsel. At the close of the hearing, the Mississippi court continued the protective order against Lauralee, denied her motion to dismiss for lack of jurisdiction under the Mississippi abuse statute, and took under advisement her motion to dismiss for lack of jurisdiction to modify the Utah decree as well as the modification request.

The Mississippi court did not rule on the petition to modify the Utah divorce decree until August 1988, some five months after the hearing.[1] On August 8, the Mississippi court ruled, pursuant to the Parental Kidnapping Prevention Act of 1980, 28 U.S.C. § 1738A (1989) ("the PKPA"), that it did not have jurisdiction to modify the Utah divorce decree. However, the court did not dissolve the protective order against Lauralee.

On September 12, Lauralee sought and obtained from the Fourth Judicial District Court of Utah an order requiring William to show cause why he should not be held in contempt for failing to return the children to Utah. On September 23, her counsel in Mississippi filed a motion to dissolve the Mississippi protective order. The Mississippi court found Lauralee's motion to be frivolous and assessed fees against her.

On October 24, William filed a second motion with the Mississippi court to modify the Utah divorce decree. At that time the children had been living in Mississippi for just over eight months. It had been less than a year since the Utah divorce decree was issued. That same day William obtained an interlocutory order from the Mississippi court granting physical custody to him pending the final judgment, with an order requiring pick-up of the children.[2]

On November 10, the Fourth District's domestic relations commissioner, Howard Maetani, held a hearing on Lauralee's order to show cause and concluded that Mississippi did not have jurisdiction to modify the divorce decree because Utah had never relinquished jurisdiction. He therefore recommended against enforcement of the Mississippi order and in favor of issuing a restraining order against William. William moved to dismiss Commissioner Maetani's order and objected to his ruling.

On December 5, the Mississippi court issued a final judgment on William's second motion to modify the Utah decree. The Mississippi court found that the children had been present in the state for at least six months,[3] that the parties had significant connections with the state, and that modification by the Mississippi court was in the best interests of the children.[4] These findings were likely based on the jurisdictional prerequisites found in the

1. During this time, Lauralee took no action in Utah, apparently waiting for the decision in Mississippi.

2. Some time earlier during October, Lauralee went to Mississippi and took the children back with her to Utah. After the unfavorable ruling by the Fourth District Court, the children were apparently returned to Mississippi where we assume they remain.

3. The court seems not to have focused on the fact that the only reason the younger children

had been present in the state for over six months was because the Mississippi court continued a "temporary" protective order for that length of time.

4. Although the court did not rely on this point in its final modification order, the Mississippi court also noted that Lauralee had invoked the jurisdiction of the Mississippi court by moving the court to dissolve the protective order.

Uniform Child Custody Jurisdiction Act adopted in Mississippi, Miss.Code Ann. §§ 93–23–1 to –47 (1989) ("the UCCJA").[5] The Mississippi court determined that it had jurisdiction to modify the Utah divorce decree and issued an order granting permanent custody of all seven children to William.

On January 12, 1989, William's objection to Commissioner Maetani's ruling came before Utah's Fourth District Court. Prior to his decision, the judge, who had entered the initial Utah decree, conferred by phone with the Mississippi judge.[6] In its opinion, the Fourth District Court stated:

Both courts ... recognized that only one state—the state of continuing jurisdiction—has power to modify a divorce decree. Both courts further adhered to the principle that only the state with continuing jurisdiction decides whether to decline the exercise of its jurisdiction over the Decree of Divorce. Both Courts concluded there can be no concurrent jurisdiction between the State of Utah and the State of Mississippi and that under normal circumstances Utah has continuing jurisdiction to make subsequent changes or new orders concerning the custody of children when such matters have been previously decided in a Utah Decree of Divorce.[7]

Despite these findings, the Utah court concluded that Lauralee had made a "general appearance" in Mississippi during the hearing in late February and early March of 1988, and thereby submitted herself to the jurisdiction of the Mississippi court. The Utah court thereupon dismissed the order to show cause and granted William's motion to enforce the order of the Mississippi court giving him custody of the children. Lauralee appeals from these rulings of the Utah court.

■ In this appeal, we address two important issues. First, we analyze the issue of subject matter jurisdiction in custody modification proceedings. Second, we address Lauralee's "general appearance" and what effect that appearance had on Mississippi's subject matter jurisdiction. Initially we note that, on appeal, both parties based their arguments primarily upon interpretations of the UCCJA, a uniform statute enacted in both states. Because we find that the PKPA directly addresses the issues before this court, creates a very manageable two-prong test for determining modification jurisdiction, and would govern in the event of any conflict with the UCCJA or other state law,[8] we focus our analysis on

5. The court claimed to have incorporated into the December 5 decision its earlier opinion of August 9. However, unlike in the August 9 opinion, the court now determined that it had jurisdiction to modify the Utah custody decree. Apparently, the court determined that Utah no longer had continuing jurisdiction because the children had remained in Mississippi for eight months prior to William's second motion for modification.

In the December 5 decision, the Mississippi court did not discuss the PKPA as it related to its jurisdiction or to William's conduct. However, it concluded that Lauralee had violated the PKPA by taking the children from Mississippi in October in violation of the protective order premised on Mississippi state law. This conclusion is most ironic since, as is hereafter shown, the court's protective order of indefinite duration was itself entered in violation of the PKPA.

6. The trial court relied on *Coppedge v. Harding,* 714 P.2d 1121 (Utah 1985) (per curiam), as the basis for its prudent decision to confer by telephone with the Mississippi court. The record does not disclose why the Mississippi judge had not seen fit to confer with his Utah counterpart at the outset. Such a timely conference may

well have avoided, or at least greatly minimized, the subsequent difficulties.

7. The conclusions reached between the Utah and Mississippi courts as a result of the telephone conversation would seem to be inconsistent with the Mississippi court's conclusions reached in its decision to modify. It may be that the Mississippi court was persuaded that, although Utah had not lost its jurisdiction, Lauralee's "general appearance" circumvented the jurisdictional problem.

8. "As a federal jurisdictional statute, the PKPA establishes a policy of federal pre-emption in the area of custody jurisdiction. Consequently, under the Supremacy Clause of the United States Constitution, the PKPA takes precedence over [state law]." *Voninski v. Voninski,* 661 S.W.2d 872, 876 (Tenn.Ct.App.1982), *modified on other grounds, State ex rel. Cooper v. Hamilton,* 688 S.W.2d 821, 824 (Tenn.1985). *Accord Applegate v. Gant,* 460 So.2d 1293, 1294 (Ala.Civ. App.1984) (if UCCJA and PKPA conflict, PKPA prevails); *Murphy v. Woerner,* 748 P.2d 749, 750 (Alaska 1988) ("PKPA preempts state law"); *Enslein v. Enslein,* 112 A.D.2d 973, 492 N.Y.S.2d 785, 787 (1985) (PKPA preempts UCCJA).

the federal statute.[9]

## SUBJECT MATTER JURISDICTION AND THE PARENTAL KIDNAPPING PREVENTION ACT

### 1. Generally

It is particularly appropriate to apply the PKPA in this dispute because the federal act was specifically created to deal with this kind of case. We need not turn to general legislative history to ascertain this fact. Congress formulated specific "findings and purposes" which were thereafter enacted as part of the PKPA, though not codified. *See generally* Parental Kidnapping Prevention Act of 1980, Pub.L. No. 96–611, § 7, 94 Stat. 3568, 3568–69 (1980). In these "findings and purposes," Congress recognized the lack of a national standard to guide states in resolving their jurisdictional disputes in the area of child custody.[10] *Id.* Without a national standard, states were reaching inconsistent and conflicting results. *Id.* Thus, disgruntled noncustodial parents, like William in this case, were tempted to snatch children away from the custodial parent and to seek a more favorable decree from another state. *Id.*

In response to these problems, Congress enacted the PKPA. Its expressed purpose was "to establish national standards under which the courts of [each state] will determine their jurisdiction to decide such disputes and the effect to be given by each such [state] to such decisions by the courts of other such [states]." *Id.* at Pub.L. No. 96–611, § 7(b). These standards guide and instruct courts to "ascertain the *one* state with jurisdiction to modify an existing child custody order." *Murphy v. Woerner*, 748 P.2d 749, 750 (Alaska 1988) (emphasis added). In most cases, the appropriate state will be the one that issued the original decree, fulfilling the "strong Congressional intent to channel custody litigation into a court having *continuing* jurisdiction." *Mark L. v. Jennifer S.*, 133 Misc.2d 454, 506 N.Y.S.2d 1020, 1023 (Fam.Ct.1986) (em-

9. Though we base our decision on the PKPA, we do not mean to suggest that the result would be different under the UCCJA. *See generally* Bodenheimer, *Interstate Custody: Initial Jurisdiction and Continuing Jurisdiction under the UCCJA*, XIV Fam.L.Q. 203 (1981) (article draws many of the same conclusions under the UCCJA that we draw under the PKPA). *See also Rawlings v. Weiner*, 752 P.2d 1327 (Utah Ct.App.1988) (custody modification question resolved without reference to PKPA). Without belaboring the point, we recognize the complementary interplay between the UCCJA and the PKPA. *See generally* Donigan, *Child Custody Jurisdiction: New Legislation Reflects Public Policy Against Parental Abduction*, 19 Gonz.L.Rev. 1 (1983/84).

Like the PKPA, the UCCJA was created "to remedy th[e] intolerable state of affairs where self-help and the rule of 'seize and run' prevail...." Lansing & Sherman, *The Legal Response to Child Snatching*, 7 J.Juv.L. 16, 19 (1983) [hereafter "Lansing & Sherman"] (quoting UCCJA, Commissioners' Prefatory Note, 9 U.L.A. 112 (1979)). Its focus is upon both initial custody decrees and modification decrees. *See, e.g.,* Miss.Code. Ann. § 93–23–5(1) (1989). It was designed to establish rules and policies which would limit a state's discretion to exercise jurisdiction over custody cases and to encourage states to cooperate and exchange information toward the end of finding the most appropriate forum. *See* Lansing & Sherman at 20. In the context of initial custody decrees, the UCCJA is still an important source for determining which state, among several having an interest in the case, should exercise jurisdiction in a particular dispute.

The PKPA is also important in the context of initial custody decrees. Though not designed to deal with initial custody decree determinations per se, *see* 28 U.S.C. § 1738A(a), it provides criteria which must be followed in the initial custody decree if that state wishes to retain jurisdiction in the event that a second state is asked to modify that decree. *See* 28 U.S.C. 1738A(c)(2) (1989). These criteria differ somewhat from those provided by the UCCJA.

In the context of modification jurisdiction, the PKPA is the final word. It is "not a radical departure from the [UCCJA]; in fact, the two acts are similar if not identical on a number of points." Note, *The Parental Kidnapping Prevention Act: Application and Interpretation*, 23 J.Fam.L. 419, 426 (1984–85). However, whereas the UCCJA created the possibility for concurrent jurisdiction in modification proceedings, the PKPA provides a rigid formula for determining the single state with modification jurisdiction. Because of the PKPA's specificity, we choose to apply it rather than the UCCJA in this case.

10. It is most enlightening to note that Congress found this lack of a national standard even though 44 states had adopted some form of the UCCJA at the time the PKPA was enacted. *See* Bodenheimer, *Interstate Custody: Initial Jurisdiction and Continuing Jurisdiction under the UCCJA*, XIV Fam.L.Q. 203, 203 (1981).

phasis in original). By limiting the discretion of individual state courts, Congress has removed the success of forum shopping and thus the incentive for child snatching. *See E.E.B. v. D.A.*, 89 N.J. 595, 446 A.2d 871, 876 (1982), *cert. denied*, 459 U.S. 1210, 103 S.Ct. 1203, 75 L.Ed.2d 445 (1983); *Tufares v. Wright*, 98 N.M. 8, 644 P.2d 522, 525 (1982).

Having examined the purposes of the PKPA, we now apply its particular statutory provisions and policies to the facts before us. For ease of discussion, we will refer to the state that originally enters a custody decree as the "first state" and another state asked to modify that decree as the "second state."

> The PKPA provides in pertinent part:
> (a) The appropriate authorities of every State shall enforce ·according to its terms, and shall not modify except as provided in subsection (f) of this section, any child custody determination made consistently with the provisions of this section by a court of another State.
>
> . . . .
>
> (c) A child custody determination made by a court of a State is consistent with the provisions of this section only if—
> > (1) such court has jurisdiction under the law of such State. . . .
>
> . . . .
>
> (d) The jurisdiction of a court of a State which has made a child custody determination consistently with the provisions of this section continues as long as the requirement of subsection (c)(1) of this section continues to be met and such State remains the residence of the child or of any contestant.
>
> . . . .
>
> (f) A court of a State may modify a determination of the custody of the same child made by a court of another State, if—
> > (1) it has jurisdiction to make such a child custody determination; *and*
> > (2) the court of the other State no longer has jurisdiction, or it has de-

clined to exercise such jurisdiction to modify such determination.

28 U.S.C. § 1738A (1989) (emphasis added).

These provisions of the PKPA are dispositive of this case. They provide that a second state may only modify the custody decree of the first state in very limited circumstances, even though both states may have an interest in the matter. *In re B.B.R.*, 566 A.2d 1032, 1036 (D.C.Ct.App. 1989). Subsection (f) is the key modification provision of the PKPA and creates a two-prong test for courts to apply. Before a second state may modify the decree of the first state, (1) the second state must have such jurisdiction as would permit it to make an initial custody determination and (2) the first state must have lost or given up its continuing jurisdiction. We analyze each of these prongs separately.

### 2. FIRST PRONG: Mississippi's Jurisdiction To Make Initial Custody Determination

William asserted that the Mississippi court initially had jurisdiction under the emergency provision of Mississippi's UCCJA and the Mississippi Protection From Domestic Abuse Law, Miss.Code Ann. §§ 93–21–1 to –29 (1989). Moreover, when the Mississippi court modified the custody order, it relied upon the children's eight-month stay in Mississippi prior to its modification decree and upon a "best interests" analysis.

#### a. *Emergency Jurisdiction*

▮▮ Assuming no prior custody decree, the emergency provision of the Mississippi UCCJA might have provided jurisdiction to the Mississippi courts. That provision, which is identical to Utah Code Ann. § 78–45c–3(1)(c)(ii) (1987), grants jurisdiction if "[t]he child is physically present in this state and . . . it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse or is otherwise neglected or dependent." Miss.Code Ann. § 93–23–5(1)(c)(ii) (1989). The PKPA has a similar provision providing jurisdiction if

"the child is physically present in such State and ... it is necessary in an emergency to protect the child because he has been subjected to or threatened with mistreatment or abuse." 28 U.S.C. § 1738A(c)(2)(C)(ii).

After removing the children from Utah, William went to Mississippi and sought a protective order from a Mississippi court. The court granted a protective order under its Protection From Domestic Abuse Law. We need not determine in this appeal whether the abuse alleged by William would have been sufficient to confer jurisdiction upon a Mississippi court in the context of an initial custody determination.[11] We need only acknowledge that the alleged abuse might have entitled the Mississippi court to exercise jurisdiction in an initial custody suit and for purposes of this appeal, we consider the first prong satisfied on this basis.

Before we leave emergency jurisdiction, we need to address the protective order issued by the Mississippi court. It may well be that the Mississippi court had limited jurisdiction to issue a temporary restraining order or other interim relief to assure the immediate protection of the children. However, without satisfying the second prong of the modification jurisdiction analysis, the "emergency" did not entitle the court to continue the emergency order indefinitely or to adjudicate the modification issue.[12] *See Mitchell v. Mitchell,* 437 So.2d 122, 127 (Ala.Civ.App.1982). *See also Rawlings v. Weiner,* 752 P.2d 1327, 1330 n. 4 (Utah Ct.App.1988) (construing UCCJA). Rather, the protective order

should have continued only as long as necessary to contact the Utah court and determine which court was the correct forum to handle the emergency abuse claim and, as a separate matter, to litigate the modification issue. *See* Donigan, *Child Custody Jurisdiction: New Legislation Reflects Public Policy Against Parental Abduction,* 19 Gonz.L.Rev. 1, 13 (1983/84). *See also* Bodenheimer, *Interstate Custody: Initial Jurisdiction and Continuing Jurisdiction under the UCCJA,* XIV Fam. L.Q. 203, 225–26 (1981) (addressing "emergency" provision in UCCJA).

#### b. *Jurisdiction under "Home State" Provision*

When the Mississippi court modified the custody decree, it relied upon a provision of the UCCJA, Miss.Code Ann. § 93–23–5(1)(a)(i) (1989), which provides for jurisdiction if "[t]his state ... is the home state of the child at the time of commencement of the proceeding." *Id.* Miss.Code Ann. § 93–23–3(f) (1989) defines "home state" to mean "the state in which the child immediately preceding the time involved lived with ... a parent ... for at least six (6) consecutive months." *Id.* The PKPA contains a very similar provision.

Under these provisions, Mississippi could argue that it had jurisdiction to make an initial custody decree. The children lived with William in Mississippi for eight months pursuant to the court's protective order. If this case were about an initial custody decree, we would nonetheless have to address the fact that the children were only in Mississippi because of William's

---

**11.** Courts have held that for emergency jurisdiction to exist, there must be "evidence to indicate physical or emotional mistreatment or abuse of the children," *Jones v. Jones,* 456 So.2d 1109, 1112 (Ala.Civ.App.1984), or a "showing of a present danger to the children," *Schoeberlein v. Rohlfing,* 383 N.W.2d 386, 389 (Minn.Ct.App. 1986), or the children must be "in serious danger of immediate harm if [they remained with the other parent]." *Marks v. Marks,* 281 S.C. 316, 315 S.E.2d 158, 162 (Ct.App.1984).

**12.** William suggested that *State ex rel. W.D. v. Drake,* 770 P.2d 1011 (Utah Ct.App.1989), prevents us from applying the PKPA to this fact

situation. He relies upon a footnote in that opinion which states: "The PKPA does not apply to child neglect and dependency proceedings." *Id.* at 1013 n. 1. William's argument has no merit for several reasons. First, his protective order was based upon the Mississippi Protection From Domestic Abuse Law which covers abuse and not neglect. *See* Miss.Code. Ann. § 93–21–3(a) (1989). Second, this language from *Drake* is purely dicta in the context of a modification dispute as *Drake* only involved an initial custody determination. Finally, we reject the accuracy of this dicta as a general proposition.

wrongful conduct.[13] The children would not have had *any* connections with Mississippi were it not for William's retention of the children in Mississippi in violation of the Utah divorce decree. For purposes of this appeal, however, it is enough to note that the "home state" provision might have given Mississippi jurisdiction in an initial custody decree and we assume that the first prong was also satisfied on this basis.

### c. Jurisdiction Under "Best Interests" Provision

The Mississippi court also relied upon another provision of the UCCJA, which provides for jurisdiction if

> [i]t is in the best interest of the child that a court of this state assume jurisdiction because (i) ... the child and at least one (1) contestant, have a significant connection with the state, and (ii) there is available in this state substantial evidence concerning the child's present or future care, protection, training and personal relationships.

Miss.Code Ann. § 93–23–5(1)(b) (1989). There is a similar provision in the PKPA except that the PKPA only recognizes initial custody jurisdiction under a "best interests" analysis if "it appears that no other State would have jurisdiction under [the 'home state' provision]." 28 U.S.C. § 1738A(c)(2)(B)(i).

Again, the "best interests" provision of the UCCJA might have given Mississippi jurisdiction for an initial custody decree. The children and William were living in Mississippi and the Mississippi court found significant connections with the state as well as substantial evidence in Mississippi. Moreover, the Mississippi court found that, at the time of the modification, Mississippi had become the children's home state. Still, we would be concerned about the reason for the children's presence in Mississippi and the reasons for many of the connections with Mississippi.[14] It is sufficient to note for purposes of the instant inquiry, however, that this provision might have given Mississippi initial custody jurisdiction.

To summarize, at the time that Mississippi modified the custody decree, it is arguable that the "emergency" provision, the "home state" provision, or the "best interests" provision might have given Mississippi jurisdiction for an initial custody decree, thereby satisfying the first prong of the PKPA's test for modification jurisdiction. It is quite clear from the record, however, that the second prong of the jurisdiction analysis was not met in this case.

### 3. SECOND PRONG: Utah's Jurisdiction

The second prong of modification analysis under the PKPA prohibits a state from modifying another state's decree unless the first state either (a) lost its jurisdiction or (b) declined to exercise its modification jurisdiction.

### a. Utah Did Not Lose Its Jurisdiction

■ To determine whether Utah has lost its jurisdiction we must look to subsection (d) of the PKPA which provides:

---

**13.** A good argument can be made in opposition to Mississippi's jurisdiction based upon Miss. Code Ann. § 93–23–15 (1989). That provision states:

> If the petitioner for an initial decree has wrongfully taken the child from another state or has engaged in similar reprehensible conduct the court may decline to exercise jurisdiction if this is just and proper under the circumstances.

*Id.* At least one court has supported this position stating:

> [W]e cannot believe that the [PKPA] contemplates an approach that would enable a contesting party, particularly where wrongdoing is involved, to build up connection time in his

or her state, thereby frustrating one of Congress' purposes in enacting the PKPA—to "deter interstate abductions and other unilateral removals of children undertaken to obtain custody and visitation awards."

*In re B.B.R.,* 566 A.2d 1032, 1040 (D.C.Ct.App. 1989) (quoting Parental Kidnapping Prevention Act of 1980, Pub.L. No. 96–611, § 7(c)(6), 94 Stat. 3568, 3569 (1980)). We recognize that Mississippi concluded in its March 8 findings that William's conduct in taking the children to Mississippi without Lauralee's knowledge or permission was not wrongful. This conclusion is surely questionable.

**14.** *See* note 13, *supra.*

The jurisdiction of a court of a State which has made a child custody determination consistently with the provisions of this section continues as long as the requirement of subsection (c)(1) of this section continues to be met and such State remains the residence of the child or of any contestant.

28 U.S.C. § 1738A(d). This section imposes three requirements for continuing jurisdiction: (1) That Utah had jurisdiction for the initial custody decree; (2) that Utah had current jurisdiction under its own state laws;[15] and (3) that the children or a parent reside in Utah. *See Meade v. Meade,* 650 F.Supp. 205, 210 (M.D.N.C.1986), *aff'd,* 812 F.2d 1473 (4th Cir.1987).

Applying these three requirements, the Utah courts clearly had continuing jurisdiction. First, William has not challenged Utah's jurisdiction to enter the initial custody decree and it seems clear that Utah in fact had such jurisdiction. *See* Utah Code Ann. §§ 30–3–1(2), –10 (1989) (jurisdictional requirements for divorce and custody).[16] Second, Utah clearly had continuing jurisdiction under Utah law: "The court has continuing jurisdiction to make subsequent changes or new orders for ... the custody of the children and their support...." Utah Code Ann. § 30–3–5(3) (1989). Finally, Lauralee continued to reside in Utah throughout the controversy, thus satisfying the third requirement. We hold, therefore, that Utah had continuing jurisdiction to modify the custody decree.

### b. *Utah Did Not Decline To Exercise Jurisdiction*

A second state with jurisdiction may modify a first state's custody decree if the first state has declined to exercise jurisdiction. *See, e.g., E.E.B. v. D.A.,* 89 N.J. 595, 446 A.2d 871, 877 (1982). However, Wil-

liam never requested Utah courts to exercise their modification jurisdiction. Rather, he chose to try his luck in another forum. Therefore, not having had the opportunity to exercise its jurisdiction, we hold that the Utah court had not declined to exercise it as of the time the Mississippi orders were entered.

We conclude that Utah neither lost nor declined to exercise its jurisdiction over the custody dispute in this case. It follows that, as a matter of federal law, Mississippi had no subject matter jurisdiction to modify the decree. This is so even though Mississippi might have had jurisdiction to enter an initial custody decree under the facts as they otherwise existed except for Utah's already having done so.

### THE "GENERAL APPEARANCE"

■ In its findings and conclusions, the Utah trial court essentially conceded that only Utah had subject matter jurisdiction to modify the child custody decree. However, after noting this fact, the court went on to find that because Lauralee had litigated the issues in Mississippi she had placed "herself within the jurisdiction of the Mississippi Court." The findings suggest the Mississippi court shared these views. Consequently, the Utah court granted William's motion to enforce the Mississippi decree. The trial court's decision was incorrect.

The Utah and Mississippi trial courts apparently confused the rules concerning subject matter jurisdiction with those of personal jurisdiction. Although the Utah court agreed that Mississippi did not have subject matter jurisdiction, it used the personal jurisdiction doctrine of "general appearance" to get around that problem.[17]

---

**15.** Section 1738A(c)(1), in the context of § 1738A(d), requires that the first state continue to have jurisdiction under its own laws.

**16.** The jurisdictional validity of the original Utah decree has never been disputed in this case. At the time of the original decree, both parents and all of the minor children had been living in Utah for several years. There had been homestudies and psychological evaluations performed in order to assist the Utah court in

making its original determination. All of the pertinent evidence about the parties was located in Utah at the time of the original divorce decree.

**17.** The doctrines of "general" and "special" appearance, relied on by the court, are associated with personal jurisdiction only. Prior to the adoption of Rule 12(b) of the Rules of Civil Procedure, a party was required to allege lack of personal jurisdiction and other jurisdictional de-

■ The crux of William's argument was that Lauralee waived her jurisdictional challenge by appearing and litigating the custody question in Mississippi. Though this might be a legitimate argument against a personal jurisdiction challenge, it is not against a subject matter jurisdiction challenge, and to entertain a dispute, a court must have jurisdiction over both the subject matter of the dispute and the individuals involved. If the court lacks either type of jurisdiction, it has no power to entertain the suit. *See generally* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1350 (1969). Moreover, while defects in personal jurisdiction can be waived, subject matter jurisdiction goes to the very power of a court to entertain an action. *Id.* A lack of subject matter jurisdiction cannot be stipulated around nor cured by a waiver. *Id.* A lack of subject matter jurisdiction can be raised at any time and when subject matter jurisdiction does not exist, neither the parties nor the court can do anything to fill that void. *Id.*

We have determined that Mississippi did not have subject matter jurisdiction to enter its modification orders. Thus, even if Lauralee's appearance in the Mississippi court waived a personal jurisdiction challenge, *but see* note 17, *supra*, it in no way waived the subject matter jurisdiction challenge at issue in this case.

## CONCLUSION

The Utah trial court should have determined under the PKPA that continuing modification jurisdiction resided in the Utah court to the exclusion of Mississippi and that the orders of the Mississippi court were accordingly invalid. Moreover, its conclusion that Lauralee's general appearance in Mississippi placed her within the subject matter jurisdiction of the Mississippi court was erroneous. We reverse and remand for proceedings consistent with this opinion.[18]

BILLINGS and DAVIDSON, JJ., concur.

fects separately from other nonjurisdictional defenses. "[I]f a challenge of this type was joined with any nonjurisdictional defenses, the appearance became 'general' and the party's right to object to jurisdiction was deemed waived." 5 C. Wright & A. Miller, Federal Practice and Procedure § 1362 (1969). Today the distinction between general and special appearances has been effectively abolished by Rule 12(b), which permits jurisdictional and nonjurisdictional defenses to be joined. *See generally id.* at § 1344. *See also Ted R. Brown & Assocs., Inc. v. Carnes Corp.,* 547 P.2d 206, 207 (Utah 1976) (defendant has not made a general appearance by making a motion to release attachment).

Because of our conclusion that the Mississippi court did not have subject matter jurisdiction over the dispute, we do not decide the separate issue of the court's personal jurisdiction over the person of Lauralee. However, it appears that Lauralee was in Mississippi for the principal purpose of challenging that court's subject matter jurisdiction and only litigated the other issues because the court refused to rule on the jurisdictional question. We would be hard pressed to view her behavior as a waiver. We would likewise be loathe to embrace a rule that would effectively require a parent in Lauralee's position not to participate in a hearing on the custodial fate of his or her children lest an unruled-upon jurisdictional objection be considered waived.

18. Nothing in this opinion should be read to favor a custody determination for either William or Lauralee. We merely conclude that Utah was the only proper forum in which to bring a modification proceeding. William is in no way precluded from seeking a custody modification in Utah.